[No. H009804. Sixth Dist. July 1, 1993.]

ELYDIA ZAVALA, Plaintiff and Appellant, v.
BOARD OF TRUSTEES OF THE LELAND STANFORD, JR.,
UNIVERSITY et al., Defendants and Respondents.

**COUNSEL**

Robert N. Katz and Leslie R. Katz for Plaintiff and Appellant.

Wines & Manoukian, Socrates Peter Manoukian, Wines & Diepenbrock and J. Thomas Diepenbrock for Defendants and Respondents.

**OPINION**

**MIHARA, J.**—Plaintiff Elydia Zavala appeals from a judgment of nonsuit in her medical malpractice action against defendants. We affirm the judgment.

On March 18, 1987, plaintiff filed a complaint in which she alleged that physician Judith Brillman failed to properly diagnose and treat plaintiff on June 5, 1986. Plaintiff claimed that, as a result of this alleged negligence, necessary surgery was delayed, causing her permanent damage. Plaintiff's attorney verified the complaint on information and belief for the stated reason that plaintiff "is absent from the county in which I have my office." Defendants filed an unverified answer to plaintiff's complaint. Trial commenced on March 9, 1992. Defendants moved for nonsuit after plaintiff's opening statement. The motion was denied. After the completion of opening statements, plaintiff asserted that nonsuit was precluded because defendants

had failed to file a verified answer to the complaint. The court did not rule on plaintiff's assertion at that time.

Plaintiff then presented the testimony of plaintiff's mother, Ann Zavala. Ann testified that plaintiff had a shunt implanted in her brain in 1981.[1] Thereafter, the shunt was surgically adjusted or replaced several times. Plaintiff went to Stanford University Hospital (hereafter SUH) every six months to have the shunt checked. In December 1984 plaintiff was diagnosed as having a brain tumor. On June 1, 1986, Ann took plaintiff to SUH. Plaintiff seemed disoriented and she was vomiting and screaming. Dr. Sutton performed tests on plaintiff at SUH and then plaintiff went home. The next day Ann called another hospital but did not take plaintiff there to be seen. Instead, she took plaintiff to her family physician. Over the next two days Ann made numerous calls to SUH attempting to reach certain physicians there. She spoke with Dr. Hanbery at SUH on June 4, but she did not take plaintiff to SUH at that time.

On June 5 plaintiff had the same symptoms she had displayed on June 1. Ann took plaintiff to see Dr. William Lee at John Muir Memorial Hospital. Lee made a written record of plaintiff's symptoms and recommended that plaintiff be seen at SUH for further "workup." Ann took this written record with her. At approximately 2 p.m. on June 5, Ann arrived at the SUH emergency room with plaintiff. Ann told a nurse that she thought plaintiff was experiencing shunt failure and that she needed help. Plaintiff was placed on a bed and about three hours later Dr. Morikawa and defendant Brillman came to see plaintiff. Ann gave Brillman the written record Lee had made of plaintiff's symptoms which contained Lee's recommendation for further "workup." Brillman talked with plaintiff and Morikawa examined plaintiff's eyes. Plaintiff was then sent home. On June 12 plaintiff went to University of California San Francisco (hereafter UCSF) Hospital but was not admitted to the hospital. On June 14 Ann took plaintiff back to UCSF Hospital and plaintiff was admitted to the hospital. On June 16 plaintiff had shunt replacement and abdominal surgery.

After Ann testified, plaintiff provisionally rested and defendants moved for nonsuit. Plaintiff moved for judgment on the pleadings based on defendants' failure to verify their answer. Plaintiff's motion was denied. Defendants argued that nonsuit should be granted because there was no evidence that defendants had breached the applicable standard of care on June 5,

---

[1]While no *evidence* explained how a shunt functioned, plaintiff's attorney described the function of a shunt in his opening statement. A shunt is a tube which allows excess fluid which has accumulated in the brain to drain to the abdomen. Plaintiff required a shunt because she suffered from a buildup of fluid in her brain.

1986. Since there was insufficient evidence to support a res ipsa loquitur theory, defendants asserted that plaintiff could not make her case without expert testimony. Plaintiff argued that Lee's written record of plaintiff's symptoms and his recommendation for "further workup" required defendants to perform an examination. Plaintiff's attorney represented that he would present expert testimony "that it is medical negligence not to examine" under these circumstances.

Defendants had moved *in limine* to exclude testimony by experts who did not qualify under Health and Safety Code section 1799.110, subdivision (c). They renewed this motion at trial. Plaintiff's attorney originally proposed calling Dr. Andrews to testify that defendants' conduct was negligent but Andrews refused to testify for plaintiff. Plaintiff's attorney then represented that Lee would testify that defendants' conduct was negligent. He also suggested that an undisclosed expert, Dr. Foltz, might be able to give such testimony. The court refused to allow Foltz to testify. The court and counsel then had a conference call with Lee to determine whether Lee would testify that defendants' conduct was negligent. Lee was asked whether he would testify that defendants were negligent. Lee said: "I referred Zavala over down to Stanford one morning, and because she needed to be evaluated further and then something happened. It was done to the point, but maybe not totally. I don't know. Who to decide that is that I don't know whether I am saying the right way or not, but this is sort of my recollection." Lee stated that he was not an emergency room physician. The court found that Lee could not qualify under Health and Safety Code section 1799.110, subdivision (c) because he was not an emergency room physician. The court refused to allow the case to go to the jury on a res ipsa loquitur theory because the evidence was insufficient to support that theory. Since plaintiff could not produce expert testimony to support her claim of negligence and res ipsa loquitur was not supported by the evidence, the court granted defendants' motion for nonsuit.

## DISCUSSION

### A. *Verification Issue Waived*

"When the complaint is verified, the answer shall be verified." (Code Civ. Proc., § 446.) Plaintiff's complaint was verified by plaintiff's attorney because plaintiff was absent from the county where her attorney had his office.[2] Defendants' answer was not verified. However, plaintiff did not object to defendants' failure to verify their answer prior to the commencement of trial. Only after defendants moved for nonsuit did plaintiff first

---

[2]"When the verification is made by the attorney for the reason that the parties are absent from the county where he or she has his or her office . . . the pleadings shall not otherwise

mention the lack of verification. Plaintiff claimed that the lack of verification precluded nonsuit. When defendants again moved for nonsuit after plaintiff had presented her case, plaintiff moved for judgment on the pleadings based on defendants' failure to verify their answer. ■ On appeal, plaintiff claims that nonsuit was improper because of defendants' pleading error. We disagree.

Plaintiff waived any objection to defendants' failure to verify their answer when she failed to object to the lack of verification prior to trial. Plaintiff made no objection to the lack of verification until defendants moved for nonsuit. Plaintiff's objection at this point was improper and untimely. "[T]he proper objection where a party fails to verify a pleading is a motion to strike . . . which may be made only upon timely notice and provides for hearing and extension of time to answer." (*Perlman* v. *Municipal Court* (1979) 99 Cal.App.3d 568, 575 [160 Cal.Rptr. 567], internal citations omitted.) When plaintiff proceeded to trial without objecting to the lack of verification, she waived any right to object to defendants' pleading error. (*Hill* v. *Nerle* (1916) 29 Cal.App. 473, 475 [156 P. 981]; *Ware* v. *Stafford* (1962) 206 Cal.App.2d 232, 237 [24 Cal.Rptr. 153]; see also *McCullough* v. *Clark* (1871) 41 Cal. 298, 302.) Hence, she could not properly raise this issue at trial and cannot now raise it on appeal.

## B.  *Experts*

■ Plaintiff challenges the trial court's refusal to admit expert testimony by Lee and Foltz. Plaintiff initially intended to call Andrews as an expert witness. After Andrews refused to testify at trial, plaintiff sought admission of expert testimony by Lee or Foltz. Defendants objected to plaintiff calling any expert witnesses who could not qualify under Health and Safety Code section 1799.110.[3] Plaintiff made no attempt to show that Foltz was qualified under Health and Safety Code section 1799.110 and the court refused to allow Foltz to testify. After Lee stated that he was not an emergency room physician and that he had not practiced as an emergency

be considered as an affidavit or declaration establishing the facts therein alleged." (Code Civ. Proc., § 446.) Consequently, though the statute requires verification of an answer to a verified complaint, it also provides that attorney verification of the allegations of a complaint cannot transform the allegations of the complaint into evidence. Hence, plaintiff could not avoid nonsuit by resorting to the verified allegations of her complaint because those allegations were not "evidence."

[3]Defendants also moved to exclude any undisclosed expert witnesses pursuant to Code of Civil Procedure section 2034, subdivision (j). Although Lee and Foltz were not disclosed by plaintiff as expert witnesses, their testimony was not excludable under Code of Civil Procedure section 2034, subdivision (j) because the demand for disclosure was made less than 70 days prior to the trial date in violation of Code of Civil Procedure section 2034, subdivision (b).

room physician in the last five years, the court found that Lee was not qualified to testify under Health and Safety Code section 1799.110, subdivision (c). Plaintiff claims that the trial court's exclusion of Lee and Foltz under Health and Safety Code section 1799.110 was erroneous. We find no error.

"In any action for damages involving a claim of negligence against a physician and surgeon providing emergency medical coverage for a general acute care hospital emergency department, the court *shall* admit expert medical testimony *only* from physicians and surgeons who have had substantial professional experience within the last five years while assigned to provide emergency medical coverage in a general acute care hospital emergency department." (Health & Saf. Code, § 1799.110, subd. (c), italics added.) Emergency medical "coverage" is not defined in Health and Safety Code section 1799.110. However, subdivision (a) of the statute refers to "emergency medical services" and subdivision (b) defines "emergency medical services" as "those medical services required for the immediate diagnosis and treatment of medical conditions which, if not immediately diagnosed and treated, could lead to serious physical or mental disability or death." (Health & Saf. Code, § 1799.110, subds. (a), (b).)

The first issue is the meaning of "emergency medical coverage." In *Jutzi v. County of Los Angeles* (1987) 196 Cal.App.3d 637 [242 Cal.Rptr. 74] the Second District Court of Appeal decided that "emergency medical coverage" was synonymous with "emergency medical care" and "emergency medical services." (*Jutzi v. County of Los Angeles, supra,* 196 Cal.App.3d at p. 647.) This conclusion is inconsistent with a proper construction of the language of the statute. Subdivision (a) of the statute uses the term "emergency medical services" and subdivision (b) defines that term. Subdivision (c) uses the word "coverage." ■ "[W]hen *different* words are used in contemporaneously enacted, adjoining subdivisions of a statute, the inference is compelling that a difference in meaning was intended." (*People v. Jones* (1988) 46 Cal.3d 585, 596 [250 Cal.Rptr. 635, 758 P.2d 1165].) This compelling inference becomes overwhelming when viewed in light of the legislative history which indicates that subdivision (c) was intended to apply to "emergency physicians." "Coverage" is not synonymous with "care" or "services." (Webster's Collegiate Dict. (10th ed. 1993) pp. 173, 267-268, 1076.) ■ "Coverage," as it is used in Health and Safety Code section 1799.110, subdivision (c), refers to a physician's "territory or field of activity." (Webster's, *supra* , at p. 268.) A physician "providing emergency medical coverage for a general acute care hospital emergency department" is a physician whose "field of activity" is the provision of emergency medical services in a hospital's emergency department. Such a physician is usually described as

an emergency room physician. Therefore, when faced with a claim that an expert does not qualify under Health and Safety Code section 1799.110, subdivision (c), the initial question the court must decide is not whether the actual treatment rendered constituted emergency medical care, as *Jutzi* proclaimed, but whether the defendant physician was acting as an emergency physician in an emergency department when the defendant physician did the allegedly negligent acts. (Contra *Jutzi* v. *County of Los Angeles, supra,* 196 Cal.App.3d at p. 647.)

██ Since it was undisputed that Brillman was responsible for providing emergency medical services in the SUH emergency department and was acting in that capacity when the alleged negligence occurred, Health and Safety Code section 1799.110, subdivision (c) governed the admissibility of expert testimony in this action. The statute precludes expert testimony by a witness who has not had substantial experience as an emergency room physician in the last five years. (Health & Saf. Code, § 1799.110, subd. (c).) Since Lee stated that he was not an emergency room physician and that he had not acted as an emergency room physician in the last five years, he could not testify as an expert in this action. Plaintiff made no attempt to show that Foltz was qualified to testify.

The provisions of Health and Safety Code section 1799.110, subdivision (c) are mandatory. When a party to an action governed by the statute objects to expert testimony on the ground that the witness does not qualify under Health and Safety Code section 1799.110, subdivision (c), the trial court may not allow that witness to give expert testimony unless the party offering the witness makes a showing that the witness is qualified under that statute. Plaintiff did not make such a showing. Since the trial court could not admit expert testimony in the absence of a proper showing, it did not err in excluding plaintiff's proposed expert testimony.

## C. *Nonsuit*

Notwithstanding the lack of expert testimony, plaintiff asserts that nonsuit was improper. ██ "[A] trial court may not grant a defendant's motion for nonsuit if plaintiff's evidence would support a jury verdict in plaintiff's favor." (*Campbell* v. *General Motors Corp.* (1982) 32 Cal.3d 112, 117-118 [184 Cal.Rptr. 891, 649 P.2d 224].) ██ Plaintiff claims that she presented sufficient evidence to support a jury verdict in her favor even in the absence of expert testimony because defendants' negligence was apparent to a layperson. Plaintiff's evidence does not support this claim. Plaintiff arrived at the SUH emergency room complaining of vomiting and disorientation. She had with her Lee's written record of her symptoms and his recommendation for further tests. Plaintiff had a preexisting diagnosed brain tumor and

a shunt in her brain. After speaking with plaintiff and conducting at least a cursory examination, defendants concluded that there was "no evidence of organic intercranial pathology" and suggested that plaintiff make an appointment with the SUH neurosurgery clinic where she had been treated in the past. Plaintiff next obtained medical services a week later when she was seen at UCSF and sent home. Two days later she was admitted to UCSF Hospital. Plaintiff underwent surgery two days after her admission to UCSF Hospital.

" 'Negligence on the part of a physician or surgeon will not be presumed; it must be affirmatively proved.' [Citations.] While in a restricted class of malpractice cases the courts have applied the doctrine of res ipsa loquitur, that has been only where 'negligence on the part of a doctor is demonstrated by facts which can be evaluated by resort to common knowledge [and] expert testimony is not required since scientific enlightenment is not essential for the determination of an obvious fact.' [Citation.]" (*Huffman* v. *Lindquist* (1951) 37 Cal.2d 465, 474 [234 P.2d 34, 29 A.L.R.2d 485].) Expert testimony is required unless it is a matter of common knowledge what conduct was required under the particular circumstances of the case. (*Landeros* v. *Flood* (1976) 17 Cal.3d 399, 410 [131 Cal.Rptr. 69, 551 P.2d 389, 971 A.L.R.2d 324].)

"The proper methods to be employed in the diagnosis of an internal abdominal [or brain] ailment, as well as the merits of such a diagnosis, are peculiarly within the knowledge or province of experts. . . . 'A broken or dislocated member of the body . . . presents an entirely different problem from internal disorders whose manifestations are obscure and often misleading.' " (*Lawless* v. *Calaway* (1944) 24 Cal.2d 81, 88-89 [147 P.2d 604].) The relationship between the accumulation of fluid in the brain and the manifestation of symptoms thereof is *not* a matter of common knowledge. A layperson is not possessed of the medical knowledge necessary to determine whether vomiting and disorientation are indicative of shunt failure, fluid accumulation, infection or any other internal disorder. Without expert testimony on the standard of care which explained the relationship between plaintiff's symptoms and the necessity for treatment, the jury could not determine whether Brillman's conduct was negligent.

■     Nevertheless, plaintiff claims that there was sufficient evidence to support a jury verdict on a res ipsa loquitur theory. The doctrine of res ipsa loquitur is applicable only where the injury upon which the action is based is of the kind which ordinarily does not occur in the absence of negligence. (*Ybarra* v. *Spangard* (1944) 25 Cal.2d 486, 489 [154 P.2d 687, 162 A.L.R. 1258].) Plaintiff's evidence failed to even describe the precise nature of plaintiff's injury. Without such information or expert testimony, the jury was

not capable of concluding that plaintiff had suffered an injury which ordinarily does not occur in the absence of negligence. As plaintiff's evidence was entirely insufficient to support such a finding, the trial court did not err in granting nonsuit.

## CONCLUSION

The judgment is affirmed.

Premo, Acting P. J., and Elia, J., concurred.