[No. C017726. Third Dist. Nov. 16, 1994.]

KAY H. JAMES, Plaintiff and Appellant, v.
ST. ELIZABETH COMMUNITY HOSPITAL et al., Defendants and
Respondents.

## COUNSEL

Rolland L. Papendick for Plaintiff and Appellant.

Moss & Enochian, Steven R. Enochian and Mark D. Norcross for Defendants and Respondents.

## OPINION

**DAVIS, J.**—In this medical malpractice case arising out of an emergency room visit, plaintiff Kay James appeals from a judgment of nonsuit in favor of defendants St. Elizabeth Community Hospital and Christopher Louisell, M.D. Nonsuit was granted after plaintiff's expert was deemed unqualified to testify under Health and Safety Code section 1799.110, subdivision (c). (All

further undesignated section references are to the Health and Safety Code.) Section 1799.110, subdivision (c) states: "(c) In any action for damages involving a claim of negligence against a physician and surgeon providing emergency medical coverage for a general acute care hospital emergency department, the court shall admit expert medical testimony only from physicians and surgeons who have had substantial professional experience within the last five years while assigned to provide emergency medical coverage in a general acute care hospital emergency department. For purposes of this section, 'substantial professional experience' shall be determined by the custom and practice of the manner in which emergency medical coverage is provided in general acute care hospital emergency departments in the same or similar localities where the alleged negligence occurred."

The issue is whether section 1799.110, subdivision (c) (hereafter, subdivision (c)) applies whenever an emergency room physician treats a patient in a general acute care hospital emergency department, or whether subdivision (c) applies only when such a physician performs "emergency medical services" (as defined in § 1799.110, subd. (b)) in such an emergency department. We hold that subdivision (c) applies whenever an emergency room physician treats a patient in a general acute care hospital emergency department.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1989 plaintiff sued Dr. Louisell, alleging that he failed to properly treat her fractured ring finger when she sought care at St. Elizabeth Community Hospital's (St. Elizabeth) emergency room. It is undisputed that Dr. Louisell is an emergency room physician and that St. Elizabeth's emergency room is within a general acute care hospital emergency department. Defendants moved for nonsuit after opening statements. The court did not rule on the motion at that time, and the trial proceeded.

Plaintiff testified to the following: On July 19, 1988, plaintiff injured her left ring finger moving boxes at work. Later that day, plaintiff visited a nearby clinic and was told that her finger was not broken. A clinic doctor applied a splint consisting of a "tongue depressor type piece of wood" and tape. The splint held the plaintiff's middle and ring fingers straight. During the night, plaintiff's ring finger swelled; as her engagement and wedding rings tightened, the pain increased.

The next day, plaintiff returned to the clinic to have her rings removed. The clinic doctor did not have ring removal equipment. Plaintiff then went to

the sheriff's department. The sheriff's deputies also declined to remove plaintiff's rings because "they were afraid they were gonna hurt me."

At approximately 6:30 p.m., plaintiff went to St. Elizabeth's emergency room. The emergency room personnel removed plaintiff's rings. Plaintiff felt immediate relief. Dr. Louisell requested to further examine plaintiff, and she consented. Dr. Louisell ordered X-rays. After reading the X-rays, Dr. Louisell informed plaintiff that her left ring finger had a small break on the knuckle.

Dr. Louisell and a nurse reapplied the same wooden splint plaintiff had been given the day before. Dr. Louisell instructed plaintiff to leave the splint on for three to four weeks and to then see her own doctor.[1] About four weeks later, plaintiff saw her physician. When the physician removed the splint, plaintiff was unable to bend her fingers. Plaintiff underwent extensive physical therapy for approximately a year, and her attorney claimed in his opening statement that plaintiff still suffers residual effects.

During recess, the judge addressed the defendants' nonsuit motion. Defendants argued that plaintiff did not have a qualified expert under subdivision (c) to maintain her action. Plaintiff conceded that her expert, Dr. Gordon Smith, did not qualify under subdivision (c). However, plaintiff argued that subdivision (c) did not apply to her case because subdivision (c) applies only if "emergency medical services" are rendered. The trial court concluded that Dr. Louisell rendered "emergency medical services" to plaintiff and therefore that subdivision (c) did apply. (In passing, the trial court recognized that subdivision (c) may also apply outside the "emergency medical services" context.) After deeming plaintiff's only expert unqualified under subdivision (c), the trial court granted the defendants' nonsuit motion.

DISCUSSION

The only issue on appeal involves the interpretation of subdivision (c).

Certain rules of statutory construction guide our interpretation. The basic objective of statutory interpretation is to ascertain and effectuate legislative intent. (*Department of Fish & Game* v. *Anderson-Cottonwood Irrigation Dist.* (1992) 8 Cal.App.4th 1554, 1562 [11 Cal.Rptr.2d 222].) "In determining intent, we look first to the words themselves." (*Ibid.*) "[W]e read the words

---

[1]These facts were disputed by defendants' counsel in his opening statement. However, evidence contrary to plaintiff's evidence was not provided because nonsuit was granted shortly after plaintiff testified.

of the statute according to their 'usual, ordinary, and common sense meaning' consistent with the statute's apparent purpose . . . ." (*Al-Sal Oil Co.* v. *State Bd. of Equalization* (1991) 232 Cal.App.3d 969, 976 [283 Cal.Rptr. 843].)

" 'When the [statutory] language is clear and unambiguous, there is no need for construction. . . . When the language is susceptible of more than one reasonable interpretation, [as it is here], we look to a variety of extrinsic aids. . . .' " (*Department of Fish & Game* v. *Anderson-Cottonwood Irrigation Dist., supra,* 8 Cal.App.4th at p. 1562, quoting *People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1007-1008 [239 Cal.Rptr. 656, 741 P.2d 154], citation omitted.) These extrinsic aids include the ostensible objects to be achieved, the legislative history, public policy, and the statutory scheme of which the statute is a part. (*Ibid.*) Finally, the "words [of a statute] should be interpreted to make them workable and reasonable . . . , in accord with common sense and justice, and to avoid an absurd result. . . ." (See *Halbert's Lumber, Inc.* v. *Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1239 [8 Cal.Rptr.2d 298].)

Subdivision (c) is part of section 1799.110 which reads in its entirety:

"(a) In any action for damages involving a claim of negligence against a physician and surgeon arising out of emergency medical services provided in a general acute care hospital emergency department, the trier of fact shall consider, together with all other relevant matters, the circumstances constituting the emergency, as defined herein, and the degree of care and skill ordinarily exercised by reputable members of the physician and surgeon's profession in the same or similar locality, in like cases, and under similar emergency circumstances.

"(b) For the purposes of this section, 'emergency medical services' and 'emergency medical care' means those medical services required for the immediate diagnosis and treatment of medical conditions which, if not immediately diagnosed and treated, could lead to serious physical or mental disability or death.[2]

"(c) In any action for damages involving a claim of negligence against a physician and surgeon providing emergency medical coverage for a general acute care hospital emergency department, the court shall admit expert medical testimony only from physicians and surgeons who have had substantial professional experience within the last five years while assigned to provide emergency medical coverage in a general acute care hospital emergency department. For purposes of this section, 'substantial professional

---

[2]Although subdivision (b) defines "emergency medical services" and "emergency medical care," the latter term does not appear elsewhere in section 1799.110.

experience' shall be determined by the custom and practice of the manner in which emergency medical coverage is provided in general acute care hospital emergency departments in the same or similar localities where the alleged negligence occurred." (All further references to undesignated subdivisions will be to these subdivisions.)[3]

The problem is that subdivision (c) uses the undefined term "emergency medical coverage" while subdivision (a) uses the defined term "emergency medical services."

Two competing theories have developed regarding the proper interpretation of subdivision (c). The Second District, in *Jutzi* v. *County of Los Angeles* (1987) 196 Cal.App.3d 637, 647 [242 Cal.Rptr. 74], noted that "emergency medical coverage" is "apparently synonymous" with "emergency medical services." Plaintiff urges us to adopt the *Jutzi* interpretation. Plaintiff argues that Dr. Louisell's alleged negligence did not arise out of "emergency medical services," as defined in subdivision (b). Plaintiff asserts that after her ring was removed, any "emergency" that may have existed was over, and Dr. Louisell was then providing routine services. Consequently, plaintiff maintains, since her action against Dr. Louisell does not arise out of "emergency medical services," subdivision (c) does not apply here.

Contrary to *Jutzi*, the Sixth District in *Zavala* v. *Board of Trustees* (1993) 16 Cal.App.4th 1755, 1762 [20 Cal.Rptr.2d 768], construed "emergency medical coverage" as having its own meaning. The *Zavala* court interpreted "coverage" as referring to a physician's "territory or field of activity." (*Ibid.*) The *Zavala* court noted that the common definition for "coverage" is different from "care" or "services." (*Ibid.*) The court cited the rule that when different words are used in contemporaneously enacted, adjoining subdivisions of a statute, the inference is compelling that different meanings were intended. (*Ibid.*, citing *People* v. *Jones* (1988) 46 Cal.3d 585, 596 [250 Cal.Rptr. 635, 758 P.2d 1165].) Based on this reasoning, *Zavala* concluded: "When faced with a claim that an expert does not qualify under Health and Safety Code section 1799.110, subdivision (c), the initial question the court must decide is not whether the actual treatment rendered constituted emergency medical care, as *Jutzi* proclaimed, but whether the defendant physician was acting as an emergency physician in an emergency department when the defendant physician did the allegedly negligent acts." (*Zavala, supra*, at p. 1763.)

For the most part, we agree with the holding in *Zavala*. We conclude that the term "emergency medical coverage" is broader than the term "emergency

---

[3]The term "physicians and surgeons" is a generic one that encompasses all licensed physicians. (See Bus. & Prof. Code, §§ 2050, 2051, 2055.)

medical services," and subdivision (c) applies whenever an emergency room physician treats a patient in a general acute care hospital emergency department.[4]

In reaching this conclusion, we first examine the statute's language. (See *Department of Fish & Game* v. *Anderson-Cottonwood Irrigation Dist.*, *supra*, 8 Cal.App.4th at p. 1562; *Halbert's Lumber, Inc.* v. *Lucky Stores, Inc.*, *supra*, 6 Cal.App.4th at p. 1238.) The Legislature used the term "emergency medical services" in subdivision (a), defined that term in subdivision (b), and then used a different term, "emergency medical coverage," in the very next subdivision (subdivision (c)). Tellingly, the Legislature copied subdivision (a)'s first clause, "In any action for damages involving a claim of negligence against a physician and surgeon arising out of emergency medical services," and placed it in subdivision (c), *except* for the phrase "arising out of emergency medical services." In place of the excepted phrase the Legislature in subdivision (c) substituted the words, "providing emergency medical coverage." The logical inference is that "emergency medical coverage" has a different meaning than "emergency medical services" and subdivision (c)'s scope is not circumscribed by subdivision (a)'s usage. The use of a different term is especially revealing, given the alignment of section 1799.110's subdivisions.

Subdivision (c)'s language has a broader focus than subdivision (a)'s. In subdivision (a) the phrase "*arising out of* emergency medical *services* provided in a general acute care hospital emergency department" refers to a specific set of circumstances. (Italics added.) In subdivision (c), the Legislature used the words "*providing* emergency medical *coverage* for a general acute care hospital emergency department." (Italics added.) "Providing" is a more general term, in this context, than "arising out of"; and "coverage," as suggested in *Zavala*, is a broader term than "services," and means "territory or field of activity." (*Zavala* v. *Board of Trustees*, *supra*, 16 Cal.App.4th at p. 1762.) Therefore, subdivision (c) should be applied whenever a physician's territory or field of activity includes a general acute care hospital's emergency department. (See fn. 4, *ante.*)

This broader view of subdivision (c) accords with the purpose of section 1799.110. Section 1799.110 was enacted in 1978 as former section 1768 and

---

[4]It is unclear whether *Zavala* deems subdivision (c) applicable only to "emergency room physicians." (See 16 Cal.App.4th at pp. 1762-1763.) Potentially, subdivision (c) could also apply to other physicians—for example, those physicians who respond to requests for assistance in the emergency room but who are not normally "emergency room physicians." However, these issues, as in *Zavala*, are not before us, and we express no views on them. As noted, it is undisputed that when plaintiff was treated, Dr. Louisell was an emergency room physician and that St. Elizabeth's emergency room was within a general acute care hospital emergency department.

was part of a larger article on Good Samaritans. (Stats. 1978, ch. 130, §§ 2, 8, pp. 342, 345.) The legislative package which included former section 1768 was designed to promote "the development, accessibility, and provision of emergency medical services to the People of the State of California." (Stats. 1978, ch. 130, § 2, p. 342.) ▇ As the *Jutzi* court recognized, ". . . the clear purpose of section 1799.110 is to encourage the provision of emergency medical care by preventing malpractice claims based on the assertion that an emergency room physician fell below the standard of care which could have been provided by a specialist in the particular field acting under nonemergency conditions . . . ." (*Jutzi* v. *County of Los Angeles, supra,* 196 Cal.App.3d at p. 651.)

▇ Our adoption of the broader interpretation of subdivision (c) comports with this purpose and with the realities of medical practice in a general acute care hospital emergency department. Although many emergency room visits are not a matter of life and death, patients receive treatment in a markedly different environment than in the relaxed office confines of a private practitioner. Not only is the atmosphere of an emergency room quite different, but so is the typical doctor-patient relationship that is found there.[5]

A document that appears in the Senate Judiciary Committee files regarding the enactment of former section 1768 noted the following unique characteristics regarding emergency room care (Legis. Bill File, [Assem. Bill No. 1301,] Senate Committee on Judiciary, [Aug. 8, 1977]). Under state law, every seriously ill patient who comes to an emergency room must be treated if appropriate facilities and personnel are available. (Health & Saf. Code § 1317.) Outside of an emergency room, physicians can choose their patients, avoiding the higher risk ones. Physicians covering emergency rooms must make instantaneous decisions, often without the benefit of medical histories, consultation, or time for reflection. Emergency room visits are stressful even under the best conditions. Emergency room physicians do not have the benefit of establishing ongoing relationships with patients. Thus, patients have less confidence and trust in doctors who practice in the emergency room. Emergency room physicians must treat patients with all types of injuries and illnesses. A "specialist" in emergency care, that is, a doctor who only does emergency room work, becomes the ultimate "generalist." (See also Wigder & Moffat, Standards of Care in Emergency Medicine, *supra,* § 2.4.)

---

[5]See, for example, Wigder and Moffat, Standards of Care in Emergency Medicine (1994) §§ 2.4, 2.5, pp. 2.4-2.7, describing the unique aspects of care in an emergency department; Los Angeles Times article, Shuit, *Hospitals' Walk-In Powder Kegs* (Feb. 10, 1993) page A1, column 1, reporting on the violence in large city emergency rooms; and *The Standard of Care in Emergency Room Procedure, Legal Aspects of Medical Practice* (Dec. 1977) J. Legal Med. 45, describing the triage system used in emergency rooms.

Most of these factors are present regardless of whether the person seeking treatment in an emergency room presents a true emergency or a mere routine ailment. In this milieu, the "routine" may be hardly commonplace.

■ These differing definitions for subdivision (a)'s "emergency medical services" and subdivision (c)'s "emergency medical coverage" are logically compatible within section 1799.110's structure. Subdivision (c) has a broader scope and requires a plaintiff suing an emergency room physician for malpractice to present expert testimony from a physician who has had substantial emergency room experience within the last five years. Subdivision (a) offers the allegedly negligent emergency room physician who rendered "emergency medical services" the benefit of a jury instruction on the "locality rule." (See 36 Cal.Jur.3d, Healing Arts, § 164, pp. 360-361; 99 A.L.R.3d 1133; 18 A.L.R.4th 603.) In other words, the physician under subdivision (a) is judged against the standard of care for providing "emergency medical services" in the "same or similar locality". It sets forth a jury instruction and applies if the emergency room physician has rendered a particular kind of treatment, defined as "emergency medical services." (See fn. 4, *ante.*) Subdivision (c) sets forth standards for expert testimony and applies if the emergency room physician has rendered any kind of treatment in a general acute care hospital's emergency department.

■ Generally, a plaintiff must have a qualified expert to maintain a medical malpractice action. (See *Gannon* v. *Elliot* (1993) 19 Cal.App.4th 1, 6-7 [23 Cal.Rptr.2d 86].) ■ The clearer the rule for when a particular expert is needed, the better it is for an efficient and just resolution of the case. Under our interpretation, the question is simply whether the defendant physician was acting as an emergency physician in a certain emergency department when the allegedly negligent acts occurred; if the answer is yes, subdivision (c) applies. (See fn. 4, *ante.*) Under the *Jutzi* standard, by contrast, a plaintiff will be forced to speculate whether "emergency medical services" were actually provided, and if the negligence arose out of those services.

Applying the *Jutzi* standard to the case at hand exemplifies the problems with that standard. Plaintiff went to St. Elizabeth's emergency room because she needed to have her rings removed. Was this a situation that could lead to "serious physical or mental disability or death?" (The standard for "emergency medical services"; see § 1799.110, subd. (b).) Reasonable minds could differ.

In order for the trial judge to make such a determination, expert testimony would be helpful. At a trial's early stages there has been little opportunity

for testimony or other proof. Thus, the trial judge may be forced to make a decision on inadequate information, or hold hearings on the treatment and the seriousness of the patient's condition, all to determine the kind of expert required for the case to proceed.

Further, plaintiff's alleged negligent treatment occurred after her ring was removed. Arguably, the "emergency medical service" was completed when the ring was cut off, and plaintiff's small fracture, if left untreated, may or may not have led to serious physical disability or death. These facts raise the general question, when do "emergency medical services" end? Consider an accident victim; has the "emergency medical service" ended when the bleeding is stopped, the patient is stabilized, the last stitch is sewn, or when the patient is transferred to a regular hospital room?

These difficult factual questions regarding whether or when "emergency medical services" were provided would have to be answered by the trial court as preliminary questions of fact in determining what kind of expert testimony is required. (Evid. Code, § 400 et seq.) Granted, the trial court will have to determine whether "emergency medical services" were rendered in order to apply subdivision (a)'s jury instruction. However, this decision can be made, and argued by the parties, after the benefit of a trial. The issue posed by subdivision (a) does not address whether the action can be maintained; but the issue posed by subdivision (c) goes to the heart of the action's viability. Thus, our construction of the terms "emergency medical services" and "emergency medical coverage" is not only logical, but renders the statute more efficient for the parties and the trial court alike.

The judgment is affirmed.

Puglia, P. J., and Raye, J., concurred.