[No. F021622. Fifth Dist. June 8, 1995.]

MICHAEL MIRANDA, Plaintiff and Appellant, v.
NATIONAL EMERGENCY SERVICES, INC., et al., Defendants and
Respondents.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part B.

**COUNSEL**

Byrum, Holland & Griffin, David R. Griffin and Alan B. Harris for Plaintiff and Appellant.

Ericksen, Arbuthnot, Kilduff, Day & Lindstrom and R. Ernest Montanari for Defendants and Respondents.

## OPINION

**DIBIASO, J.**—In the published portion of this opinion we construe and apply Health and Safety Code section 1799.110, subdivision (c), which sets qualifications for medical experts in certain actions for medical malpractice arising out of treatment rendered in the emergency department of a general acute care hospital. We will ultimately reverse the judgment for the reasons expressed in the unpublished part of this opinion.

### STATEMENT OF THE CASE

Plaintiff and appellant, Michael Miranda (appellant), filed a medical malpractice action in Kern County Superior Court, based on treatment he received for a laceration to his right ankle during three visits to the Kern Valley Hospital emergency room. He maintains that on all three occasions defendants and respondents, Edward Santoro, M.D., Kevin Chiasson, M.D., and Jennifer Steeper, M.D. (respondents), negligently failed to diagnose his severed Achilles tendon, thereby causing him physical, emotional, and financial injury.

On March 17, 1994, the trial court granted respondents' *in limine* motion to bar plaintiff's designated expert, Jerrold M. Sherman, M.D., from testifying about relevant standard of care issues. Respondents claimed that Dr. Sherman did not meet the qualifications for expert witnesses set by Health and Safety Code section 1799.110, subdivision (c).[1] The trial court also refused to allow appellant to call Hugh West, M. D., respondents' designated expert, to testify during appellant's case-in-chief about the applicable standard of care.[2]

According to appellant's *in limine* offer of proof, which was based in part upon the deposition testimony of Dr. Sherman, Dr. Sherman served as a consultant to the emergency room at Santa Monica Hospital twice a month, and had, during every week for the last five years, been "in the emergency room" as a consulting orthopedic physician. In connection with this work he had treated "at least two or three lacerated Achilles tendons." He last "covered the emergency room" at Santa Monica Hospital the Tuesday preceding the date of the *in limine* hearing in this case. While he has provided emergency treatment in the Santa Monica Hospital Emergency

---

[1]All subsequent statutory references are to the Health and Safety Code unless otherwise stated.

[2]In addition, the trial court ordered that appellant would not be allowed to call any of the three respondent physicians for the purpose of testifying to the standard of care. Appellant does not challenge this ruling on appeal.

Room since he started his practice 20 years ago, he is not an "emergency room physician"; he is "an orthopedic specialist called to the emergency room to take care of orthopedic problems."

When appellant told the court that its *in limine* orders made it impossible for him to satisfy his burden of proof, respondents moved for dismissal under Code of Civil Procedure section 581, subdivision (d).[3] The court granted respondents' motion on March 21, 1994. The issues raised by the trial court's rulings with respect to the two experts have been preserved for appellate review. (See *Richaud* v. *Jennings* (1993) 16 Cal.App.4th 81, 86 [19 Cal.Rptr.2d 790].)

## DISCUSSION

### A. *Appellant's Designated Expert*

Section 1799.110 reads, in full, as follows:

"(a) In any action for damages involving a claim of negligence against a physician and surgeon arising out of emergency medical services provided in a general acute care hospital emergency department, the trier of fact shall consider, together with all other relevant matters, the circumstances constituting the emergency, as defined herein, and the degree of care and skill ordinarily exercised by reputable members of the physician and surgeon's profession in the same or similar locality, in like cases, and under similar emergency circumstances.

"(b) For the purposes of this section, 'emergency medical services' and 'emergency medical care' means those medical services required for the immediate diagnosis and treatment of medical conditions which, if not immediately diagnosed and treated, could lead to serious physical or mental disability or death.

"(c) In any action for damages involving a claim of negligence against a physician and surgeon providing *emergency medical coverage* for a general acute care hospital emergency department, the court shall admit expert medical testimony only from physicians and surgeons who have had substantial professional experience within the last five years while assigned to provide *emergency medical coverage* in a general acute care hospital emergency department. For purposes of this section, 'substantial professional

---

[3]Code of Civil Procedure, section 581, subdivision (d) provides in relevant part: "[t]he court shall dismiss the complaint, or any cause of action asserted in it, in its entirety or as to any defendant, with prejudice, when upon the trial and before the final submission of the case, the plaintiff abandons it."

experience' shall be determined by the custom and practice of the manner in which *emergency medical coverage* is provided in general acute care hospital emergency departments in the same or similar localities where the alleged negligence occurred." (Italics added.)

█ Appellant contends the trial court erred when it (1) held that his expert medical witness had to qualify under section 1799.110, subdivision (c), and (2) refused to permit Dr. Sherman to testify regarding the standard of care.[4] The parties stipulated in the trial court that Kern Valley Hospital is a general acute care hospital within the meaning of subdivision (c) of section 1799.110. The issues before us are, therefore: (1) whether any of the respondents were providing "emergency medical coverage" for Kern Valley Hospital at the time the asserted negligence occurred; and, if so, (2) whether the record before the trial court established that Dr. Sherman had "substantial professional experience within the last five years while assigned to provide emergency medical coverage in a general acute care hospital emergency department." For the reasons expressed, we answer the first question in the affirmative and the second in the negative.

██ The meaning of the phrase "emergency medical coverage" has been addressed in two divergent lines of appellate authority. In *Jutzi* v. *County of Los Angeles* (1987) 196 Cal.App.3d 637, 647 [242 Cal.Rptr. 74], the court referred to the "apparently synonymous term 'emergency medical care' " which is expressly defined in subdivision (b) of section 1799.110. Under the rationale of *Jutzi*, "emergency medical coverage" for purposes of the application of subdivision (c) consists of " 'those medical services required for the immediate diagnosis and treatment of medical conditions which, if not immediately diagnosed and treated, could lead to serious physical . . . disability or death.' " (*Jutzi, supra,* 196 Cal.App.3d at p. 647, original italics omitted; see also *Baxter* v. *Alexian Brothers Hospital* (1989) 214 Cal.App.3d 722, 726 [262 Cal.Rptr. 867].) Appellant asks this court to adopt the *Jutzi* rationale and conclude that section 1799.110, subdivision (c) is inapplicable to his action against respondents. He takes the position the facts presented to the trial court demonstrated he did not receive "emergency medical care" from any of the respondents.

The Sixth District disagreed with *Jutzi* in *Zavala* v. *Board of Trustees* (1993) 16 Cal.App.4th 1755, 1762 [20 Cal.Rptr.2d 768]. Of decisive significance to the *Zavala* court was the Legislature's choice of the words "emergency medical coverage" in subdivision (c) of section 1799.110 instead of

---

[4]We assume the propriety of all aspects of the *in limine* proceedings which led to the trial court's rulings, as appellant raises no issue in his briefs concerning such matters. We do note that whether section 1799.110, subdivision (c) applies and whether a proposed expert satisfies its requirements have been held to be fit subjects of an *in limine* motion. (*Sigala* v. *Goldfarb* (1990) 222 Cal.App.3d 1450, 1456 [266 Cal.Rptr. 96].)

the words "emergency medical services," which are used in subdivision (a) of the statute. *Zavala* applied the principle that where different terms appear in two adjoining subdivisions of the same statute, " 'the inference is compelling that [different meanings were] intended.' " (16 Cal.App.4th at p. 1762.) As the *Zavala* court saw it, "[a] physician 'providing emergency medical coverage . . .' is a physician whose 'field of activity' is the provision of emergency medical services in a hospital's emergency department. Such a physician is usually described as an emergency room physician. Therefore, when faced with a claim that an expert does not qualify under [subdivision (c) of section 1799.110] the initial question the court must decide is not whether the actual treatment rendered constituted emergency medical care, as *Jutzi* proclaimed, but whether the defendant physician was acting as an emergency physician in an emergency department when the defendant physician did the allegedly negligent acts." (*Zavala, supra,* at pp. 1762-1763.)

With considerable further analysis, the Third District "agree[d] with the holding in *Zavala*" in *James* v. *St. Elizabeth Community Hospital* (1994) 30 Cal.App.4th 73, 79 [35 Cal.Rptr.2d 372]. *James* concluded "that the term 'emergency medical coverage' is broader than the term 'emergency medical services,' and subdivision (c) [of section 1799.110] applies whenever an emergency room physician treats a patient in a general acute care hospital emergency department." (*James, supra,* at pp. 79-80.)

We are convinced the construction given to subdivision (c) of section 1799.110 by *James* and *Zavala* is correct. We therefore hold that "emergency medical coverage" means treatment provided in the emergency department of a general acute care hospital by a physician who is "on-duty" in the emergency department at the time. Thus, a physician who elects, for whatever reason, to treat one of his or her private patients in the emergency room of an acute care hospital, at a time when the physician is not charged with the obligation to provide emergency room professional services, would not have the benefit of subdivision (c) in any malpractice action brought by the patient with respect to such treatment.[5]

Still unanswered explicitly by the case law, however, is the question whether the phrase "emergency medical coverage" in section 1799.110, subdivision (c), also means treatment by "other physicians—for example, those physicians who respond to requests for assistance in the emergency

[5]The physician might, however, have the benefit of subdivision (a) of section 1799.110 if he or she provided the patient with "emergency medical services" as defined in subdivision (b) of the statute.

room but who are not normally 'emergency room physicians.' " (*James* v. *St. Elizabeth Community Hospital, supra,* 30 Cal.App.4th at p. 80, fn 4.) *Zavala* is unclear on the point; *James* recognized the problem but had no need to address it. (*Ibid.*) In *Sigala* v. *Goldfarb, supra,* 222 Cal.App.3d at page 1453, the expert admitted he had "never worked as an emergency room physician" and "had not been assigned to provide emergency medical coverage in a general acute care hospital emergency department" within the requisite five years.

The issue is genuine. Whatever method is selected by a hospital to professionally staff its emergency room,[6] it is common for members of the hospital's general medical staff who are specialists in a particular field, such as cardiology or orthopedic medicine, to be available (on call) on a rotating basis, either voluntarily or as a requirement of hospital general medical staff membership, to come to the emergency room when requested by an emergency room physician and provide, as necessary, consultation or assistance to the emergency physician or treatment to a patient in the emergency room. (Rowland, *supra,* at pp. 334-335.)

The language of subdivision (c) of section 1799.110 does not state in so many words that it does not apply to treatment or services provided in the emergency room by an "on-call" specialist. The common definition of "coverage," to wit, "the act or fact of including or treating" (Webster's Third New Internat. Dict. (1986) pp. 524-525), would support construing the phrase "emergency medical coverage" to include services provided by "on-call" specialty physicians. Such an interpretation would apparently be consistent with a particular connotation given the word "coverage" by the medical profession; Dr. Sherman, in describing his qualifications, used "coverage" to refer to the time he spent "on call" to the emergency room.

On the other hand, the subject of the first segment of section 1799.110, subdivision (c) is a physician who provides "emergency medical coverage *for* a general acute care hospital emergency department." (Italics added.) In addition, subdivision (c) authorizes expert medical testimony only from those physicians who are shown to have acquired the requisite experience "while *assigned* to provide emergency medical coverage *in*" the emergency

---

[6]A hospital may use a variety of means to provide "on the premises" medical staffing for its emergency room, including (1) hiring salaried physicians who practice exclusively in the emergency room, (2) requiring all members of the hospital medical staff to devote a certain portion of their time, usually on a rotating basis, to service in the emergency room, and (3) contracting with an independent group of physicians who act as the professional medical personnel for the emergency room. (Rowland & Rowland, Hospital Management (1984) pp. 334-335 [hereinafter Rowland].)

department of a general acute care hospital. (Italics added.) The highlighted words suggest to us—though the inference is far from overwhelming—that the intended focus of the phrase "emergency medical coverage" is those physicians who work as the on duty professional staff of an emergency room rather than those specialists who provide services in an emergency room only on an "as needed, as called" basis.

Moreover, a construction of "emergency medical coverage" which encompassed "on call" specialists would seem to be inconsistent with the thus far accepted legislative purpose underlying section 1799.110, which is to "encourage the provision of emergency medical [services] by preventing malpractice claims based on the assertion that an *emergency room physician* fell below the standard of care which could have been provided by a specialist in the particular field acting under nonemergency conditions . . . ." (*Jutzi* v. *County of Los Angeles*, *supra*, 196 Cal.App.3d at p. 651, italics added; accord, *James* v. *St. Elizabeth Community Hospital*, *supra*, 30 Cal.App.4th at p. 81.) However, assuming the words "emergency room physician" in this statement are meant to refer to only the designated professional staff of an acute care hospital's emergency room, there is no mention in *Jutzi*, where the statement of legislative intent first appeared, of any specific authority or statutory history to support a conclusion the Legislature wanted subdivision (c) to apply to only those physicians. And, as we explained earlier, we do not believe the words "emergency medical coverage" themselves compel a holding that professional services rendered in the emergency room by an "on-call" specialist fall outside the scope of the subdivision.

Having found the express text of subdivision (c) of section 1799.110 to be uncertain on the point, it is proper to seek to uncover the relevant intent and purpose behind the subdivision by reference to related statutes or approved extrinsic aids which disclose the relevant legislative history. (*O'Brien* v. *Dudenhoeffer* (1993) 16 Cal.App.4th 327, 333 [19 Cal.Rptr.2d 826].) Because we find nothing of assistance in the companion statutes to section 1799.110 contained in chapter 9 of division 2.5 of the Health and Safety Code, we turn to the legislative history of section 1799.110.

Section 1799.110 was promulgated in 1983 as a verbatim reenactment of former section 1768, which was contemporaneously repealed. (Stats. 1983, ch. 1246, §§ 5, 41.) The language of section 1799.110 is unchanged from the original language of former section 1768. (Stats. 1978, ch. 130, § 8, pp. 345-346.)

As first proposed, Assembly Bill No. 1301, which added section 1768 to the Health and Safety Code, sought to limit the civil damages exposure of

certain professionals who provided emergency medical services in defined settings to only that liability which arose out of acts or omissions performed in a grossly negligent or intentional manner. (Legislative Analyst (June 3, 1977) Analysis of Assem. Bill No. 1301 (Fazio) as amended May 12, 1977.) Among the intended beneficiaries of the statutory protection were "[p]hysicians . . . providing emergency medical services in a hospital emergency department" and "[p]hysicians assisting emergency room physicians located in hospitals." (*Ibid.*) However, during the legislative process this portion of the bill underwent radical change. (See Sen. Com. Rep. & Digest May 8, 1978.) By virtue of an amendment initiated in the Conference Committee, the segment of proposed section 1768 "relating to consulting physicians [was] deleted from the bill." (Letter of Assemblyperson Vic Fazio to Governor Edmund G. Brown, Jr. (May 10, 1978) urging the Governor to sign Assem. Bill No. 1301.)[7] The final version of the bill was considered at an open hearing before the Conference Committee and subsequently adopted by vote of the committee. (*Ibid.*) Finally, the bill was submitted to and approved by both houses of the Legislature. (*Ibid.*)[8] As a result, the limited civil liability shield for emergency room physicians and assisting physicians included in the original bill was replaced by provisions that were substantially the same as those contained in former section 1768 as enacted and that now appear in section 1799.110.

The drafting history of former section 1768 is persuasive evidence the Legislature intended the phrase "emergency medical coverage" in the statute (and thus in its successor section 1799.110) to refer only to treatment given by those physicians who serve as the dedicated medical staff of an acute care

---

[7]Assembly Bill No. 1301 became law on May 11, 1978, without the Governor's signature. (Stats. 1978, ch. 130.)

[8]The legislative materials we have used to assist in ascertaining legislative intent are proper for the purpose. Legislative committee reports (*Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 219 [185 Cal.Rptr. 270, 649 P.2d 912]; *Curtis* v. *County of Los Angeles* (1985) 172 Cal.App.3d 1243, 1250 [218 Cal.Rptr. 772]) and preenactment reports by the Legislative Analyst (*Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 300 [250 Cal.Rptr. 116, 758 P.2d 58]) have been sanctioned as legitimate sources of legislative intent. In addition, a statement by the sponsoring legislator has also been approved, to the extent it "evidences the understanding of the Legislature" and not simply the particular legislator's personal views. (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 589 [128 Cal.Rptr. 427, 546 P.2d 1371]; see also *People* v. *Overstreet* (1986) 42 Cal.3d 891, 900 [231 Cal.Rptr. 213, 726 P.2d 1288], and *California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699-700 [170 Cal.Rptr. 817, 621 P.2d 856].) The cited portions of the letter from Assemblyperson Fazio to Governor Brown meet this test, for they recapitulate the "discussion and events leading to adoption of proposed amendments" that transpired during the legislative processing of the pertinent part of the bill. (*California Teachers Assn.* v. *San Diego Community College Dist., supra,* 28 Cal.3d at pp. 699-700; see also *In re Marriage of Bouquet, supra,* 16 Cal.3d at p. 590.)

hospital's emergency room; that is, physicians who have been specifically employed or otherwise engaged by the hospital to furnish medical treatment in the emergency room as "emergency room physicians." The Legislature's deletion of the provision relating to consulting and assisting physicians contained in an earlier version of section 1768 is "strong evidence that the act as adopted should not be construed to incorporate the original provision." (*Central Delta Water Agency* v. *State Water Resources Control Bd.* (1993) 17 Cal.App.4th 621, 634 [21 Cal.Rptr.2d 453]; see also *Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 607 [45 Cal.Rptr. 512].) Thus, the history of section 1768 confirms what *Jutzi* appears to have concluded was the relevant legislative intent—to promote the provision of emergency medical care by giving dedicated emergency room physicians a measure of protection from malpractice claims. (*Jutzi* v. *County of Los Angeles, supra,* 196 Cal.App.3d at p. 651; see also *James* v. *St. Elizabeth Community Hospital, supra,* 30 Cal.App.4th at p. 81.)

By "emergency room physician" we do not mean only those physicians who are specially trained or board certified in emergency medicine, or who practice exclusively in the field of emergency medicine.[9] Neither section 1799.110, its legislative history, nor any other statute in chapter 9 of division 2.5 of the Health and Safety Code, suggests the Legislature intended the reach of subdivision (c) to be so circumscribed. To the contrary, the last sentence of subdivision (c), which makes relevant local custom and practice with respect to the operation and staffing of emergency rooms, supports the inference the Legislature did not wish to restrict the application of subdivision (c) to "specialists" in emergency medicine.

Such a conclusion appears consistent with the purpose of the statute to enhance the availability of emergency medical care. (*Jutzi* v. *County of Los Angeles, supra,* 196 Cal.App.3d at p. 651; see also *James* v. *St. Elizabeth Community Hospital, supra,* 30 Cal.App.4th at p. 81.) Some acute care hospitals in this state may not be able to rely entirely or at all upon specialists in emergency medicine to staff their emergency rooms. Moreover, a physician who is assigned to treat patients in the atmosphere of an emergency room, whether or not a specialist in emergency medicine, must regularly "make instantaneous decisions often without the benefit of medical histories, consultation, or time for reflection." (*James, supra,* at p. 81.) Had the Legislature desired to apply section 1799.110, subdivision (c) solely to malpractice actions against specialists in emergency medicine, it could easily

---

[9]The opposite position may have been taken by the court in *Jutzi*: "[T]ort actions against emergency room physicians might persuade them to choose a *different area of specialty* . . . ." (*Jutzi* v. *County of Los Angeles, supra,* 196 Cal.App.3d at p. 651, italics added.)

have said so. In the absence of any such indicative language, we will not write the qualification into the statute.

In addition, we emphasize that we do not differentiate between emergency and nonemergency afflictions or injuries in applying subdivision (c) of section 1799.110. Hospital emergency rooms are often undoubtedly seen or used as a general medical office with conveniently extended hours. Nevertheless, emergency room patients "receive treatment in a markedly different environment than in the relaxed office confines of a private practitioner" (*James* v. *St. Elizabeth Community Hospital, supra,* 30 Cal.App.4th at p. 81) or in a hospital setting outside the emergency room. "Not only is the atmosphere of an emergency room quite different, but so is the typical doctor-patient relationship that is found there." (*Ibid.*)

We give the words "emergency medical coverage" the same meaning throughout subdivision (c) of section 1799.110. A word or phrase, or its derivatives, accorded a particular meaning in one part or portion of a law, should be accorded the same meaning in other parts or portions of the law, especially if the word is used more than once in the same section of the law. (*Stillwell* v. *State Bar* (1946) 29 Cal.2d 119, 123 [173 P.2d 313]; *Coleman* v. *City of Oakland* (1930) 110 Cal.App. 715, 719 [295 P. 59].) Thus, a proposed expert witness satisfies the standard of subdivision (c) of section 1799.110 if he or she is a physician who has had "substantial professional experience," within the five years preceding the trial, while employed or otherwise engaged by a general acute care hospital to provide treatment in its emergency room as an "emergency room physician." (See *Sigala* v. *Goldfarb, supra,* 222 Cal.App.3d at p. 1455.)

According to, section 1799.110, subdivision (c), whether the proposed expert has the required " 'substantial professional experience' shall be determined by the custom and practice of the manner in which emergency medical coverage is provided in general acute care hospital emergency departments in the same or similar localities where the alleged negligence occurred." This command is obviously intended to ensure that the performance of an emergency room physician sued for alleged malpractice in rendering emergency room treatment is evaluated under a standard of care essentially equivalent to that prevailing in emergency rooms at the time in the locality where the alleged negligence took place. The professional expertise required by the express statutory language is therefore skill and knowledge acquired "on the job" as an emergency room physician in a locality where hospital emergency care is provided in a manner substantially the same as such care is given in the locale where and when the alleged

malpractice occurred. In other words, academic credentials, or experience acquired while serving as an "on-call" specialist, or emergency room experience gained solely in hospitals or other facilities which do not deliver emergency care in essentially the same manner as it is delivered in the locale where the cause of action arose, are not enough, singly or together, to meet the demands of subdivision (c) of section 1799.110.[10]

The portion of subdivision (c) which addresses expert testimony is logical; it is also consistent with the underlying purpose of section 1799.110, that is, to encourage the provision of emergency medical services. (*Jutzi* v. *County of Los Angeles, supra,* 196 Cal.App.3d at p. 651.) In a professional negligence action against an emergency room physician, an expert called to testify about issues relating to the relevant standard of care ought to be a physician who has had "substantial professional experience" in treating patients while assigned to duty in an emergency room as an emergency room physician. The statutory objective would appear to be equally fostered by ensuring that the proposed expert be qualified to testify about a standard of care which is substantially the same as the standard of care prevailing in the locale where the emergency room treatment was provided to the plaintiff. Thus, the language of subdivision (c) of section 1799.110, although somewhat awkward, is apparent in its meaning and, when applied literally, "neither results in an absurdity nor contravenes the statute's purpose." (*Sigala* v. *Goldfarb, supra,* 222 Cal.App.3d at p. 1456.)

We recognize that the construction we have placed upon the phrase "emergency medical coverage" renders subdivision (c) of section 1799.110 different in application than subdivision (a) of section 1799.110. The court in *James* recognized this effect and discussed it in depth. (*James* v. *St. Elizabeth Community Hospital,* 30 Cal.App.4th at pp. 82-83.) We will not speculate about why the Legislature chose to word the statute in such a way as to require, under subdivision (c), that standard of care testimony be given by a "locality" qualified expert in all cases where the treatment in issue was provided in a hospital emergency department by an emergency room physician, but require, under subdivision (a), that a "locality" jury instruction be given only in those cases where emergency room treatment involved potentially disabling or life threatening conditions. For our purposes, it is enough that the Legislature used materially different language in the two subdivisions; we presume it did so consciously. The interpretation effectively given

---

[10]Whether the statute as written carries out wise or sensible policy is not our concern. (See *Rhiner* v. *Workers' Comp. Appeals Bd.* (1993) 4 Cal.4th 1213, 1226 [18 Cal.Rptr.2d 129, 848 P.2d 244].) No claim is made by appellant that the Legislature exceeded its authority in enacting section 1799.110.

section 1799.110 by *Zavala, James,* and now this court results in a logical and workable scheme. (*James, supra,* 30 Cal.App.4th at pp. 82-83.) If the Legislature had something different in mind it may amend the statute to make that otherwise undisclosed intent manifest.

Applying the foregoing principles to the record before us, it is clear appellant's malpractice claim arose out of treatment he received from each of the respondent physicians while each was on duty as an emergency room physician in the emergency department of Kern Valley Hospital. However, it is also clear appellant's offer of proof was insufficient to support a conclusion that Dr. Sherman was qualified to provide expert medical testimony under subdivision (c) of section 1799.110. Nothing in appellant's offer of proof established that Dr. Sherman had served for the prescribed five-year period as an emergency room physician in the emergency department of a general acute care hospital. In fact, Dr. Sherman frankly admitted he was not, and had not been, an emergency room physician; instead, he was an orthopedic specialist "on call" to the emergency room to consult on and treat orthopedic injuries. Thus, the trial court, on the record before it, lacked discretion to allow Dr. Sherman to testify with respect to the standard of care. (*Zavala* v. *Board of Trustees, supra,* 16 Cal.App.4th at p. 1763; *Sigala* v. *Goldfarb, supra,* 222 Cal.App.3d at pp. 1455-1456.)

B. *Respondents' Designated Expert**

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

## DISPOSITION

The judgment is reversed. Each party shall bear its own costs on appeal.

Ardaiz, P. J., and Harris, J., concurred.

---

*See footnote, *ante,* page 894.