[Civ. No. 49935. First Dist., Div. One. June 1, 1981.]

J. HART CLINTON, Plaintiff and Respondent, v.
COUNTY OF SANTA CRUZ et al., Defendants and Respondents;
THE STATE OF CALIFORNIA, Intervener and Appellant.

928

COUNSEL

George Deukmejian, Attorney General, R. H. Connett, Assistant Attorney General, Roderick E. Walston and Peter W. Van Der Naillen, Deputy Attorneys General, for Intervener and Appellant.

Adams, Levin, Kehoe, Bosso, Sachs & Bates and Robert E. Bosso for Plaintiff and Respondent.

No appearance for Defendants and Respondents.

OPINION

**NEWSOM, J.**—The present appeal, by the State of California, is from a judgment of the Santa Cruz Superior Court mandating the return of

certain land in Santa Cruz County to the zoning it had "prior to imposition of the Timber Preserve Zone" (TPZ).

As will be seen in detail, the TPZ is a zoning classification created by the Forest Taxation Reform Act (FTRA).

The sole issue presented—while variously stated by the parties—is whether the trial court improperly read notions of subjective intent, absence of logging activity, and active maintenance into the criteria by which, under Government Code section 51100 et seq., the TPZ was created.

A review of the largely undisputed factual background shows that respondent, J. Hart Clinton, owned two contiguous parcels of real property in Santa Cruz County, neither of which he used, or intended to use, for the principal purpose of the commercial growing and harvesting of timber, but both of which were found by the designated local agency—the board of supervisors—to be suitable for such purposes.

The FTRA required the county assessor to make two lists: list "A" was to include all parcels within the county already assessed for growing and harvesting timber as the highest and best use of the land, while list "B" was to include all parcels which, as of the lien date of 1976, appeared to the assessor to be "timberlands," even though not then assessed as such.

As required by statute,[1] the board on February 21, 1978, enacted ordinance No. 15329, zoning 600 parcels, including respondent's, into the TPZ. Following the disputed hearing at which this zoning action was taken, respondent sued the county to invalidate the classification, alleging that his property neither contained "timber" as defined in Government Code section 51100, subdivision (e) nor "timberlands" as defined in section 51100, subdivision (f). The action also challenged the constitutionality of the FTRA and the county's implementing ordinance, although neither of the latter issues—on which the trial court ruled adversely to respondent—has been carried over into this appeal.

The definitions at issue are set out in section 51100, subdivisions (e) and (f) as follows: "'Timber' means trees of any species maintained for

---

[1]Government Code section 51100 et seq. All references herein are to the Government Code unless otherwise specified.

eventual harvest for forest product purposes, whether planted or of natural growth, standing or down, on privately or publicly owned land, including Christmas trees, but does not mean nursery stock. [¶] 'Timberland' means privately owned land, or land acquired for state forest purposes, which is devoted to and used for growing and harvesting timber, or for growing and harvesting timber and compatible uses, and which is capable of growing an average annual volume of wood fiber of at least 15 cubic feet per acre."

From this language the trial court expressly found it a prerequisite to TPZ zoning that such lands have been in actual, as opposed to merely potential, commercial use, at the date of designation; and it is a reasonable, and even compelling, inference from such findings that the court also viewed the language "maintained for eventual harvest" as requiring active resource management practices and a correlative subjective "landowner's intent" to cultivate timber commercially before such lands could be zoned TPZ.

Before we can determine whether the statutory language has, as appellant asserts, a "plain meaning," it is necessary to consider the purpose of the FTRA in general.

Prior to the enactment of Government Code section 51100 et seq., timber and timberlands were taxed under the property tax system. This system was "criticized by timber owners because the tax fell due annually even though the owner realized no income from the standing trees, by environmentalists because timber owners were encouraged to cut excessively to avoid the tax, and by local government officials who feared a long-term reduction in tax dollars due to the widening effect of the property tax exemption for immature timber."[2]

Amendment of the state Constitution was a prerequisite to the enactment of the FTRA. Proposition 8, which was approved by the voters on the 1974 state ballot, amended the Constitution to allow the Legislature to develop a new system of forest taxation not based on property valuation. This amendment became California Constitution, article XIII, section 3, subdivision (j), which provides: "The Legislature may supersede the foregoing provisions with an alternative system or systems of taxing or exempting forest trees or timber, including a taxation system

---

[2]Assembly Revenue and Taxation Committee, California's Taxation of Timber and Timberland (1979) page 1.

not based on property valuation. Any alternative system or systems shall provide for exemption of unharvested immature trees, shall encourage the continued use of timberlands for the production of trees for timber products, and shall provide for restricting the use of timberland to the production of timber products and compatible uses with provisions for taxation of timberland based on the restrictions."

The FTRA was subsequently enacted; its immediate effect was the creation of the TPZ, which was designed "to insure that land ... continue to be available for timber production,"[3] while providing "some local control over what timberlands should be included."[4] As set forth in Government Code sections 51100, subdivisions (g) and (h), and 51115, once the zone has been established, it restricts the use of the parcels to the growing and harvesting of timber and compatible uses.[5] Finally, except where an owner requests exclusion from the TPZ, such zoning is mandatory. The restriction in use thus imposed is for a 10-year period only.

It is in this general context that we interpret the language of Government Code section 51100, subdivisions (e) and (f).

What is at once apparent is that importing the notion of subjective owner-intent and active maintenance as a prerequisite to TPZ zoning would reduce an elaborate legislative structure to a pile of ashes—since, at any given moment, one who had taken advantage of the substantial benefits created by the state in order to achieve the sweeping purpose of forest practice reform, could merely "opt" out of the system (cf. *Sierra Club* v. *City of Hayward* (1981) 28 Cal.3d 840 [171 Cal.Rptr. 619, 623 P.2d 180]). Moreover, throughout the relevant sections of the Government Code, repeated use is made of phrases which, when read in context, entirely negate the idea that actual use as of the lien date or a landowner's intent are operative factors in the zoning process. Thus, in section 51110, the county assessor is expressly given the power to designate parcels, like respondent's, not in fact being used for commercial timber harvest, but merely suitable for such purposes. In section 51110.1, subdivision (a), we find: "On or before September 1, 1977, the

---

[3]Unkel & Cromwell, *California's Timber Yield Tax* (1978) 6 Ecology L. Q. 831, 848.
[4]*Ibid.*, page 852.
[5]"Compatible" is given a broad definition as describing uses which, in the local board's view, do not "significantly detract from" or "inhibit" the growing and harvesting of timber. (Cf. Gov. Code, § 51110, subd. (b)(ii).)

assessor shall assemble a list of all parcels, which, as of the lien date in 1976, *appeared in the judgment of the assessor to constitute timberland,* but which were not assessed for growing and harvesting timber as the highest and best use of the land." (Italics added.)

Such language, we think, very clearly bespeaks an intent that the assessor's, not the owner's, designation was to be decisive—particularly given the assessee's right, as respondent had here, to contest the "B" designation. What appears doubtless, moreover, is that the legislative intent was to embrace lands not *in fact* being used for timber production as of the lien date within the TPZ designation.

To adopt the trial court's restrictive view that the statute requires active use and landowner-intent would also, in our view, flout the history and legislative intent of the FTRA, and ignore the overall legislative scheme to which the act is essentially and inextricably related. Such an interpretation would also contravene settled rules of statutory construction.

■ The fundamental goal of statutory interpretation is to ascertain the intent of the Legislature so that the purpose of the law may be effectuated. (*People* v. *Shirokow* (1980) 26 Cal.3d 301, 306-307 [162 Cal.Rptr. 30, 605 P.2d 859]; *People* ex rel. *Younger* v. *Superior Court* (1976) 16 Cal.3d 30, 40 [127 Cal.Rptr. 122, 544 P.2d 1322].) Statutory language must be read in context, keeping in mind the nature and purpose of the enactment, and must be given such interpretation as will promote rather than defeat the objective of the law. (*Steilberg* v. *Lackner* (1977) 69 Cal.App.3d 780, 785 [138 Cal.Rptr. 378].) In ascertaining legislative intent, not only the statutory language should be considered; we should also take into account the object of the legislation, the evils to be remedied, the legislative history, public policy and other matters helpful in discerning the intended meaning of the words used. (*Pennisi* v. *Department of Fish & Game* (1979) 97 Cal.App.3d 268, 273 [158 Cal.Rptr. 683]; *English* v. *County of Alameda* (1977) 70 Cal.App.3d 226, 233-234 [138 Cal.Rptr. 634].)

■ Moreover, case law instructs us to construe a statute as a whole, in harmony with other statutes relating to the general subject. (*People* v. *Shirokow, supra,* 26 Cal.3d 301, 307; *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 596 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]; *Merrill* v. *Department*

*of Motor Vehicles* (1969) 71 Cal.2d 907, 918 [80 Cal.Rptr. 89, 458 P.2d 33].) As expressed in *California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, at page 844 [157 Cal.Rptr. 676, 598 P.2d 836]: "Words must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent possible."

■ Applying these principles to the subject ordinances, we note that the significance of the phrase "maintained for eventual harvest" in section 51100, subdivision (e), is claimed by both sides as supportive of their respective positions, and we agree on a review of the record that the trial court appears to have concluded that the phrase connotes affirmative conduct by the landowner in growing timber. The phrase is not clear in its meaning, but upon our review of the legislative history and intent underlying the act, we are unable to read any subjective owner-intent or "active connotation" into the verb "maintained."

In addition to encouraging timber production and harvesting, we note the "avowed purpose of the Legislature to *protect* California's forest resources and timberlands ...." (Italics added.) (8 Pacific L.J. 371, 375 (1977); see also 6 Ecology L.Q. 831, 835.)[6] As declared in the Enrolled Bill Report on the subject legislation (Assem. Bill No. 1258): "The zoning requirements proposed in the bill should provide significant protection to prime timberland."[7]

The broad goals of the FTRA may be effectively defeated if the owner' subjective intent and prior use of the land are permitted to determine property suitable for TPZ classification. In Webster's New International Dictionary (2d ed. 1952) page 1484, we find "maintain" (from *manu tenere*, to "hold in the hand") variously defined in both active and passive senses. It is in any event a reasonable construction of the word—especially in light of context and correlative terms such as "compatible"—that it was meant to convey a lack of affirmative con-

---

[6]Such an objective is reflected in the analysis of Assembly Bill No. 1258 published by the Senate Committee on Revenue and Taxation, which reads: "State's intent is to provide a system of taxing timber, consistent with the constitutional authorization, designed to encourage forest resource management in promotion, generally, of public's need for timber and other forest products, together with need for watershed protection, fisheries and wildlife, and recreational opportunities. State also finds that existing tax system discourages the achievement of that objective."

[7]The report further states: "When land is zoned for timber-producing purposes, only uses compatible with timber production would be permitted. This should contribute to protection of timberland, particularly in areas where second home subdivisions have been encroaching on valuable timberland."

duct which would render the subject land no longer suitable for commercial timber purposes.

In our view, the definitions of "timber" and "timberland" contained in section 51100, subdivisions (e) and (f), respectively, ought not to be measured by any one owner's past forest practices or subjective intent. Rather, we conclude that land is "maintained for eventual harvest for forest product purposes" and "devoted to and used for growing and harvesting timber," for purposes of subdivisions (e) and (f) of section 51100, when it is inherently capable of being so used or maintained and has not, by prior activity, been rendered unsuitable for forest product purposes. Such an interpretation not only comports with the legislative intent, but also harmonizes section 51100 with the entire legislative scheme envisioned by the FTRA.

One remaining issue raised by respondent must be briefly considered. Respondent argues that the restrictive definition of timberlands adopted by the trial court is justified as the only interpretation of the pertinent Government Code sections which makes the statutes consistent with their constitutional source. (Cal. Const., art. XIII, § 3, subd. (j).) Respondent cites, inter alia, the following use of "timber" and "timberlands" in the Constitution. "The Legislature may supersede the foregoing provisions with an alternative system or systems of taxing or exempting *forest trees or timber*, including a taxation system not based on property valuation. Any alternative system or systems shall provide for exemption of unharvested immature trees, shall encourage *the continued use of timberlands* for the *production of timber products*, and shall provide for *restricting the use of timberland to the production of timber products and compatible uses* with provisions for taxation of timberland based on the restrictions. Nothing in this paragraph shall be construed to exclude timberland from the provisions of Section 8 of this article." (Italics added.)

Respondent submits that because the Constitution uses both the terms "forest trees" and "timber," the two must necessarily have distinct meanings; thus, while every forest tree has the potential to become a "forest product," "timber," according to respondent, must refer to trees that are *destined to become* forest products. Therefore, respondent argues, because the Government Code sections in issue adopted the term "timber" rather than "forest trees," the sections must apply exclusively to trees used or intended to be used as forest products.

We are aware of no requirement that statutory language must be synonomous with its enabling constitutional source, and find nothing in the use of "timber" rather than "forest trees" in section 51100 suggestive of a legislative intent to introduce concepts of owner-intent, actual use or logging history in place of resource capability as determinative factors. In our view, both the constitutional amendment and the implementing act are principally concerned with the latter.[8] Section 51100, as herein interpreted, though more specific than article XIII, section 3, subdivision (j) is consistent with its constitutional model.

The judgment is reversed.

Racanelli, P. J., and Grodin, J., concurred.

A petition for a rehearing was denied June 26, 1981, and the opinion was modified to read as printed above. The petition of plaintiff and respondent for a hearing by the Supreme Court was denied August 13, 1981. Richardson, J., was of the opinion that the petition should be granted.

---

[8]The expressed purpose of the constitutional amendment reveals that this is so.