Filed 5/30/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CLARA STOKES et al., | B279241 |
| Plaintiffs and Appellants, | Los Angeles County |
| v. | Super. Ct. No. BC586899 |
| ELLEN M. BAKER, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Holly J. Fujie, Judge. Reversed.

Hodes Milman Liebeck, T. Gabe Houston, Daniel M. Hodes, Lee M. Weiss; Newmeyer & Dillion, Charles S. Krolikowski and Jason Moberly Caruso for Plaintiffs and Appellants.

Haight Brown & Bonesteel, Angela S. Haskins, Vangi M. Johnson; Cole Pedroza, Curtis A. Cole, Kenneth R. Pedroza and Danica-Joyce Lam for Defendant and Respondent.

———————————————

Health and Safety Code section 1799.110, subdivision (c) states: "In any action for damages involving a claim of negligence against a physician and surgeon providing emergency medical coverage for a general acute care hospital emergency department, the court shall admit expert medical testimony only from physicians and surgeons who have had substantial professional experience within the last five years while assigned to provide emergency medical coverage in a general acute care hospital emergency department."[1] In this appeal, we must decide whether this expert qualification requirement applies to all expert medical testimony in a negligence action against an emergency room doctor, or whether it applies only to medical testimony regarding the standard of care.

Plaintiffs Clara and Vaughn Stokes sued defendant Ellen Baker, M.D., alleging Dr. Baker negligently failed to diagnose a subarachnoid hemorrhage afflicting Ms. Stokes when she presented to Dr. Baker's emergency department. They alleged Dr. Baker's negligence caused Ms. Stokes's aneurysm to go untreated until it ruptured, resulting in the cognitive and neurological difficulties Ms. Stokes now experiences.

The trial court granted Dr. Baker's motion for summary judgment, concluding plaintiffs' causation expert—a board-certified neurointerventional surgeon—was not qualified to offer medical testimony under section 1799.110 because he did not have substantial professional experience working in an emergency department. We conclude this was error. As we will discuss, section 1799.110's structure and legislative history confirm the Legislature intended the expert qualification provision to ensure only that emergency physicians are subject to a fair and practical appraisal of the applicable standard of care. Although the trial court's interpretation is consistent with the

_____

[1] Statutory references are to the Health and Safety Code, unless otherwise designated.

2

strict letter of the isolated clause, its literal construction would generate needless conflicts with Evidence Code section 720 and absurd consequences in cases where causation and damages implicate medical issues outside the experience and expertise of emergency room physicians. We reverse.

## FACTS AND PROCEDURAL BACKGROUND

Consistent with the applicable standard of review, we state the facts established by the parties' evidence in the light most favorable to plaintiffs as the nonmoving parties, drawing all reasonable inferences and resolving all evidentiary conflicts, doubts or ambiguities in plaintiffs' favor. (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 273 (*Jacks*); *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 (*Saelzler*).)

1. ***Dr. Baker's Emergency Treatment of Ms. Stokes***

Ms. Stokes presented to Torrance Memorial's emergency department on May 25, 2014, complaining of sudden pain on the back of her head radiating to her neck. She told Dr. Baker she had experienced pain in her neck and a migraine headache since twisting her neck two days earlier, and she reported a recent increase in the frequency of migraines. Ms. Stokes said she was suffering from the worst headache she had ever experienced and described her primary pain intensity as "10/10." She also reported vomiting the prior evening, and complained of right sciatic nerve pain.

Dr. Baker's physical examination of Ms. Stokes found neck tenderness, no neurologic deficit, and full strength in both arms and legs. A computerized tomography scan of Ms. Stokes's head and brain was "negative" for injury, and an x-ray of her lumbar spine was "unremarkable." An x-ray of her cervical spine revealed a congenital fusion abnormality and degenerative changes at various vertebrate. Dr. Baker contacted the on-call neurologist, who indicated he could see Ms. Stokes in two or three days. Dr. Baker did not order further testing.

Dr. Baker concluded that Ms. Stokes had an acute migraine headache, dehydration secondary to vomiting, and severe degenerative changes to her cervical spine. She prescribed Ms. Stokes pain medication and advised her to contact the neurologist for a follow-up visit. Ms. Stokes was discharged with instructions to follow up with the neurologist and to return to the emergency department if her condition worsened or if she developed new symptoms. Ms. Stokes followed up with the neurologist on May 28, 2014.

On June 4, 2014, Ms. Stokes suffered an intracranial bleed secondary to a ruptured aneurysm. She was admitted to the hospital and underwent a craniotomy and clipping. She remained intubated after the surgery and required high levels of sedation. Her hospital treatment was complicated by healthcare-associated pneumonia and staph infection. Following the ruptured aneurysm and surgery, Ms. Stokes has had persistent cognitive and physical impairments that prevent her from performing full-time work in a normal working environment.

## 2. *The Complaint*

Plaintiffs sued Dr. Baker, Torrance Memorial, and other medical professionals who had participated in Ms. Stokes's treatment, asserting causes of action for medical negligence and loss of consortium. They alleged Dr. Baker breached the standard of care by "fail[ing] to identify, diagnose, and treat, an intraventricular and subarachnoid hemorrhage in" Ms. Stokes, and by "fail[ing] to order and perform a lumbar puncture, thereby permitting the hemorrhage to progress untreated." And they alleged Dr. Baker's failure to diagnose the hemorrhage allowed it to go untreated until Ms. Stokes's aneurysm ruptured, which caused Ms. Stokes to suffer serious personal injuries.

## 3. *Dr. Baker's Motion for Summary Judgment*

Dr. Baker moved for summary judgment on the grounds that her care and treatment of Ms. Stokes were consistent with

4

the standard of care and nothing she did or failed to do caused Ms. Stokes's alleged injuries.

In support of the motion, Dr. Baker proffered the declaration of Jonathan Lawrence, M.D., a board-certified physician in emergency medicine with "extensive experience dealing with patients presenting to the Emergency Department with the complaints and symptoms such as those experienced by [Ms. Stokes] on May 25, 2014." Dr. Lawrence opined that Dr. Baker's care and treatment of Ms. Stokes "conformed with the standard of care required under the circumstances." He explained: "[T]he presentation of plaintiff [Ms. Stokes] to the [Torrance Memorial] Emergency Department on May 25, 2014 was not suspicious for subarachnoid hemorrhage. . . . The radiologic imaging ordered by Dr. BAKER was appropriate for following up on the patient's complaints of neck pain and it confirmed that plaintiff [Ms. Stokes] suffers from degenerative disk disease in the cervical spine. In addition, Dr. BAKER consulted with a Neurologist who advised that he would follow [up with] the patient in his office in two to three days. Accordingly, the index of suspicion for subarachnoid hemorrhage was low and did not require any further work-up such as a lumbar puncture."

As for causation, Dr. Lawrence opined: "It is further my opinion, to a reasonable degree of medical probability that no negligent act or omission by defendant ELLEN BAKER, M.D. caused or contributed to any injury, harm or damages as alleged by plaintiffs."

4. *Plaintiffs' Opposition*

In opposition to Dr. Baker's motion, plaintiffs proffered the declarations of emergency medicine physician Michael Ritter, M.D., and neurointerventional surgeon George Rappard, M.D.

Dr. Ritter opined that Dr. Baker fell below accepted standards of care for emergency medicine in her diagnosis, care, and treatment of Ms. Stokes. According to Dr. Ritter, Dr. Baker's

5

impression that Ms. Stokes had an acute migraine headache, dehydration secondary to vomiting, and severe degenerative changes to her cervical spine did not account for Ms. Stokes's new pattern of headaches or her sudden onset of head pain radiating to the neck.  Rather, these symptoms were consistent with a subarachnoid hemorrhage, which causes "severe headaches as well as neck pain and stiffness," and therefore "the standard of care required Dr. Baker to order all necessary testing to completely rule out a subarachnoid hemorrhage."  Dr. Ritter further explained that "[s]maller hemorrhages may not show up on a normal CT scan."  Thus, when Ms. Stokes's CT scan came back negative, "the standard of care required Dr. Baker to order a lumbar puncture," which would have "revealed blood in Ms. Stokes'[s] cerebral spinal fluid" and "confirm[ed] a subarachnoid hemorrhage."  At that point, "the standard of care would have required Dr. Baker to refer Ms. Stokes to a specialist such as a neurosurgeon or neurointerventional surgeon to address the subarachnoid hemorrhage."  By failing to order the lumbar puncture, Dr. Ritter opined Dr. Baker breached the standard of care in treating Ms. Stokes.

Dr. Rappard opined that Dr. Baker's actions were a substantial factor in causing Ms. Stokes to suffer greater injuries than she would have suffered had Dr. Baker diagnosed the subarachnoid hemorrhage when Ms. Stokes presented to the emergency department on May 25, 2014.  Based on his experience as a board-certified neurointerventional surgeon and his review of Ms. Stokes's medical records, Dr. Rappard determined Ms. Stokes's subarachnoid hemorrhage was "a small 'sentinel' or 'early warning' bleed, which denotes an aneurysm that has yet to fully rupture but will likely rupture in the near future."  Had Dr. Baker diagnosed the subarachnoid hemorrhage and referred Ms. Stokes to a neurosurgeon or neurointerventional surgeon, the specialist would have identified the aneurysm and performed "aneurysm repair surgery (endovascular coiling or aneurysm

6

clipping) on an emergent basis" that would have "successfully repaired" the aneurysm before it ruptured. This, according to Dr. Rappard, would have resulted in a better outcome for Ms. Stokes, as "the morbidity rate for repair of an un-ruptured aneurysm is approximately 2%," while "the morbidity following a subarachnoid hemorrhage from a ruptured aneurysm is approximately 70%." Thus, Dr. Rappard opined that Dr. Baker's failure to order a lumbar puncture was a substantial factor in causing Ms. Stokes to suffer the injuries she experienced following her aneurysm repair surgery, including her prolonged intubation, acute respiratory failure, and persistent cognitive issues.

5. *Dr. Baker's Reply and Evidentiary Objection to Dr. Rappard's Declaration*

Dr. Baker objected to Dr. Rappard's declaration, arguing Dr. Rappard was not qualified under section 1799.110 to offer expert medical testimony in an action for negligence against an emergency room doctor. Further, because Dr. Ritter did not opine that the failure to diagnose a subarachnoid hemorrhage caused plaintiffs' injuries, Dr. Baker argued plaintiffs had failed to raise a triable issue of fact as to causation.

Plaintiffs opposed the evidentiary objection, arguing section 1799.110 applied to only expert medical testimony regarding the standard of care for emergency room physicians, and not to the causation issues addressed in Dr. Rappard's declaration.

6. *The Trial Court's Initial Order*

After a hearing, the trial court issued an order striking Dr. Rappard's declaration, concluding Dr. Rappard was unqualified under section 1799.110 to offer expert medical testimony in the matter because he lacked substantial professional experience within the last five years in an emergency department. However, the court found Dr. Ritter's declaration raised a triable issue of fact as to whether Dr. Baker complied with the applicable standard of care in failing to order

7

a lumbar puncture to rule out a subarachnoid hemorrhage. Thus, on its own motion, the court continued the hearing on Dr. Baker's summary judgment motion, and set a schedule for supplemental briefing on only the causation issue.

7. ***Plaintiffs' Supplemental Declarations and Dr. Baker's Objections***

Plaintiffs filed supplemental declarations from Dr. Ritter and Dr. Rappard addressing the causation issue. Dr. Ritter opined, based on his review of Dr. Rappard's declaration and a conversation with Dr. Rappard, that Dr. Baker's breach of the standard of care was a substantial factor in causing plaintiffs' injuries. Dr. Rappard reaffirmed his earlier causation opinion, and emphasized that the opinion had been based on the standard of care for emergency room physicians articulated in Dr. Ritter's declaration.

Dr. Baker objected to both declarations. She maintained the trial court properly excluded Dr. Rappard's first declaration under section 1799.110, and argued Dr. Ritter was not permitted to rely upon the excluded declaration as a basis for his purported causation opinion.

8. ***The Order Granting Summary Judgment***

The trial court granted Dr. Baker's motion for summary judgment, concluding Dr. Ritter's supplemental declaration "fails to raise a triable issue of material fact as to causation." The court explained: "Dr. Ritter improperly bases his conclusions regarding causation on the declarations of Dr. Rappard, which constitute inadmissible hearsay, in direct violation of the rule . . . that an expert may not predicate an opinion upon the outside opinion of another expert. Further, the Court agrees with Dr. Baker that to allow the introduction of the outside opinion of Dr. Rappard through the declaration of Dr. Ritter would impose the improper standard of care upon Dr. Baker, which, pursuant to Health & Safety Code section 1799.110, must be determined by a medical expert with substantial professional experience while

8

assigned to provide emergency medical coverage in a general acute care hospital emergency department within the last five years."

The court entered judgment in favor of Dr. Baker. Plaintiffs filed a timely appeal.

## DISCUSSION

1. ***Standard of Review and Principles of Statutory Construction***

Summary judgment is properly granted if all the papers submitted show no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849; *Sanchez v. Kern Emergency Medical Transportation Corp.* (2017) 8 Cal.App.5th 146, 152.) A defendant meets its burden by showing that one or more essential elements of the plaintiff's cause of action cannot be established, or that there is a complete defense. (Code Civ. Proc., § 437c, subd. (*o*); *Aguilar,* at p. 849; *Saelzler, supra,* 25 Cal.4th at p. 768; *Garibay v. Hemmat* (2008) 161 Cal.App.4th 735, 741.) If the defendant makes this showing, the burden shifts to the plaintiff to demonstrate a triable issue of fact exists. (*Aguilar,* at p. 849.)

We review a trial court's ruling granting summary judgment de novo, liberally construing the nonmoving party's evidence while strictly scrutinizing the moving party's showing. (*Jacks, supra,* 3 Cal.5th 248, 273; *Saelzler, supra,* 25 Cal.4th at p. 768.) We consider all the evidence set forth in the papers, except that to which objections have been properly sustained, and all inferences reasonably deducible from the uncontradicted evidence. (Code Civ. Proc., § 437c, subd. (c); *Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 542.) " 'We apply the same three-step analysis required of the trial court. We begin by identifying the issues framed by the pleadings since it is these allegations to which the motion must respond. We then

9

determine whether the moving party's showing has established facts which justify a judgment in movant's favor. When a summary judgment motion prima facie justifies a judgment, the final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue.' " (*Gutierrez v. Girardi* (2011) 194 Cal.App.4th 925, 931-932.) Any doubts concerning the propriety of the motion must be resolved in favor of the party opposing the motion. (*Salas v. Sierra Chemical Co.* (2014) 59 Cal.4th 407, 415.)

The Courts of Appeal are divided over whether a trial court's evidentiary rulings in the context of a summary judgment motion are reviewed for an abuse of discretion (as evidentiary rulings generally are) or reviewed independently (as summary judgment motions generally are). (See *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535 [recognizing opposing positions, without deciding appropriate standard of review].) We need not weigh in on the debate here. Because the trial court's ruling to exclude Dr. Rappard's declaration turned on the court's construction of section 1799.110, subdivision (c), the ruling presents a pure question of law subject to our de novo review. (*Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1476, citing *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432.) In construing the statute, we apply the following established principles.

The " 'fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law.' " (*People v. Hull* (1991) 1 Cal.4th 266, 271; *Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715; *Klein v. United States of America* (2010) 50 Cal.4th 68, 77.) To determine the legislative intent, we look first to the words used in the statute, "because the statutory language is generally the most reliable indicator of legislative intent." (*Hassan,* at p. 715; *Klein,* at p. 77.) "[T]he various parts of the statutory enactment must be harmonized by considering the particular

clause in the context of the whole statute." (*Nunn v. State of California* (1984) 35 Cal.3d 616, 625.) And, we must keep in mind "the nature and purpose of the enactment," so as to give the language "such interpretation as will promote rather than defeat the objective of the law." (*Clinton v. County of Santa Cruz* (1981) 119 Cal.App.3d 927, 933.) In ascertaining legislative intent, our inquiry is not limited to the statutory language alone; "we should also take into account the object of the legislation, the evils to be remedied, the legislative history, public policy and other matters helpful in discerning the intended meaning of the words used." (*Ibid.*; *People v. Carron* (1995) 37 Cal.App.4th 1230, 1236.)

" 'Once the intention of the legislature is ascertained it will be given effect even though it may not be consistent with the strict letter of the statute.' " (*People v. Ali* (1967) 66 Cal.2d 277, 280.) Although ambiguity is generally a condition precedent to interpretation, " '[t]he literal meaning of the words of a statute may be disregarded to avoid absurd results or to give effect to manifest purposes that, in the light of the statute's legislative history, appear from its provisions considered as a whole.' " (*County of Sacramento v. Hickman* (1967) 66 Cal.2d 841, 849, fn. 6, quoting *Silver v. Brown* (1966) 63 Cal.2d 841, 845; see also *Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 27 (*Simpson Strong-Tie*).) " ' "It is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend." ' " (*Younger v. Superior Court* (1978) 21 Cal.3d 102, 113 (*Younger*).)

With these principles in mind, we turn to the central question presented in this appeal: Does section 1799.110, subdivision (c) require every expert who provides medical testimony in a negligence action against an emergency room doctor to have substantial professional experience within the last five years providing emergency medical coverage in an emergency department, or does the statute apply only to those

11

medical experts who testify as to an emergency room doctor's standard of care?

## 2.  *Section 1799.110 Applies to Standard of Care Testimony Only*

Section 1799.110, subdivision (c) provides:  "In any action for damages involving a claim of negligence against a physician and surgeon providing emergency medical coverage for a general acute care hospital emergency department, the court shall admit expert medical testimony only from physicians and surgeons who have had substantial professional experience within the last five years while assigned to provide emergency medical coverage in a general acute care hospital emergency department.  For purposes of this section, 'substantial professional experience' shall be determined by the custom and practice of the manner in which emergency medical coverage is provided in general acute care hospital emergency departments in the same or similar localities where the alleged negligence occurred."

In striking Dr. Rappard's declaration, the trial court construed section 1799.110, subdivision (c) to categorically bar expert medical testimony from any physician who lacked the requisite professional experience in an emergency department, regardless of the proffered testimony's subject matter.  Read in isolation, this construction is consistent with the strict letter of the expert qualification clause, which directs that in "any action for damages involving a claim of negligence" against an emergency room doctor, "the court *shall* admit medical testimony *only* from physicians and surgeons who have had substantial professional experience within the last five years" providing emergency medical coverage in an emergency department. (§ 1799.110, subd. (c), italics added.)  However, while we must acknowledge the trial court's construction conforms to a literal reading of the text, for the reasons that follow, we conclude this interpretation must be rejected because it is contrary to the

12

statute's apparent legislative intent and it would lead to absurd results.  (See *Simpson Strong-Tie, supra,* 49 Cal.4th at p. 27.)

As we will discuss, when the expert qualification clause of section 1799.110, subdivision (c) is considered within the context of the whole statute and in light of its legislative history, the Legislature's purpose in imposing a professional experience requirement is clear:  to ensure emergency room doctors are held to a practical *standard of care* by restricting expert medical testimony to physicians and surgeons who have recently experienced the unique challenges and demands of an emergency room.  Because those considerations have no bearing on the assessment of whether negligent conduct *caused* a plaintiff's alleged injuries or what *damages* are reasonable to compensate a plaintiff for such injuries, there is no logical reason to require the same experience of an expert offering medical testimony on matters other than the standard of care.  Indeed, as this case demonstrates, imposing such a requirement on causation or damages experts in cases where medical testimony is needed to establish facts outside the specialized experience and expertise of an emergency room doctor is certain to generate needless conflicts with Evidence Code section 720 and to produce absurd outcomes the Legislature could not have possibly intended.

a.     ***The language and structure of section 1799.110 suggest it applies only to standard of care issues***

Section 1799.110 expressly recognizes that emergency room physicians confront unique challenges and demands that doctors practicing in conventional medical office settings do not face. By its terms, the statute applies to a claim of negligence against a physician or surgeon arising out of "emergency medical services" or "emergency medical care," which are defined to mean "those medical services required for the immediate diagnosis and treatment of medical conditions which, if not immediately diagnosed and treated, could lead to serious physical or mental disability or death."  (§ 1799.110, subd. (b).)  As courts

13

interpreting section 1799.110 in different circumstances have recognized, emergency room doctors treat patients in "a markedly different environment than in the relaxed office confines of a private practitioner.  Not only is the atmosphere of an emergency room quite different, but so is the typical doctor-patient relationship that is found there." (*James v. St. Elizabeth Community Hospital* (1994) 30 Cal.App.4th 73, 81 (*James*).) Among other distinctions, these courts have noted that physicians covering emergency rooms must regularly "make instantaneous decisions often without the benefit of medical histories, consultation, or time for reflection." (*Ibid.*; *Miranda v. National Emergency Services, Inc.* (1995) 35 Cal.App.4th 894, 904 (*Miranda*).)

Although no court has directly addressed whether the expert qualification clause is limited to standard of care testimony, every court to consider section 1799.110's legislative intent has determined the statute's "clear purpose . . . is to encourage the provision of emergency medical care by preventing malpractice claims based on the assertion that an emergency room physician *fell below the standard of care* which could have been provided by a specialist in the particular field acting under nonemergency conditions." (*Jutzi v. County of Los Angeles* (1987) 196 Cal.App.3d 637, 651 (*Jutzi*), italics added; accord, *Sigala v. Goldfarb* (1990) 222 Cal.App.3d 1450, 1455; *James, supra,* 30 Cal.App.4th at p. 81; *Miranda, supra,* 35 Cal.App.4th at p. 902; *Petrou v. South Coast Emergency Group* (2004) 119 Cal.App.4th 1090, 1093.)  In identifying this purpose, these courts have repeatedly recognized that the statute's language almost exclusively refers to and implicates matters commonly associated with an assessment of the applicable standard of care.

For instance, the court in *James* focused on section 1799.110, subdivision (a), which instructs the trier of fact to "consider, together with all other relevant matters, the *circumstances constituting the emergency*, as defined herein,

14

and the *degree of care and skill ordinarily exercised* by reputable members of the physician and surgeon's profession in the same or similar locality, in like cases, and *under similar emergency circumstances*." (§ 1799.110, subd. (a), italics added; *James, supra,* 30 Cal.App.4th at p. 82.) As the *James* court explained, the language of subdivision (a), though not specifically referring to the standard of care, is plainly intended to ensure the physician is "judged against the *standard of care* for providing 'emergency medical services' in the 'same or similar locality.' " (*James,* at p. 82, italics added.)

The *Miranda* court was more definitive in its assessment of section 1799.110, subdivision (c). Like subdivision (a), the second sentence of subdivision (c) instructs that, in determining whether the proposed expert has the required "substantial professional experience," the court shall look to "the *custom and practice of the manner* in which emergency medical coverage is provided in general acute care hospital emergency departments in the *same or similar localities* where the alleged negligence occurred." (§ 1799.110, subd. (c), italics added.) The *Miranda* court declared "[t]his command is *obviously intended* to ensure that the performance of an emergency room physician sued for alleged malpractice in rendering emergency room treatment is evaluated under a *standard of care* essentially equivalent to that prevailing in emergency rooms at the time in the locality where the alleged negligence took place." (*Miranda, supra,* 35 Cal.App.4th at p. 905, italics added.) And the court concluded this interpretation was "logical" and "consistent with the underlying purpose of section 1799.110," explaining: "In a professional negligence action against an emergency room physician, *an expert called to testify about issues relating to the relevant standard of care* ought to be a physician who has had 'substantial professional experience' in treating patients while assigned to duty in an emergency room as an emergency room physician." (*Id.* at p. 906, italics added.)

Although these cases addressed a different issue, they nonetheless highlight an important point relevant to our construction of the statute's expert qualification clause.[2] While section 1799.110 repeatedly refers to matters implicating the standard of care, it contains no language pertaining to a factual assessment of a negligence claim's other elements. That makes sense: while a specialized knowledge of the emergency room environment is essential to understanding and assessing the sort of "instantaneous decisions" emergency room doctors must make, "often without the benefit of medical histories, consultation, or time for reflection" (*James, supra,* 30 Cal.App.4th at p. 81), the same is simply not true of medical issues arising out of the

---

[2] The issue in *Jutzi*, *James*, and *Miranda* was whether the term "emergency medical coverage" in section 1799.110, subdivision (c) should be construed to have the same meaning and scope as the term "emergency medical services" in subdivision (a). While all three recognized section 1799.110's "clear purpose" was to "encourage the provision of emergency medical care by preventing malpractice claims based on the assertion that an emergency room physician fell below the standard of care which could have been provided by a specialist in the particular field acting under nonemergency conditions" (*Jutzi, supra,* 196 Cal.App.3d at p. 651; accord, *James, supra,* 30 Cal.App.4th at p. 81; *Miranda, supra,* 35 Cal.App.4th at p. 902), the *Jutzi* court concluded the term "emergency medical coverage" was "synonymous" with "emergency medical care" and "emergency medical services." (*Jutzi,* at p. 647; see § 1799.110, subd. (b) [providing the same definition for "emergency medical care" and "emergency medical services"]; see also *Zavala v. Board of Trustees* (1993) 16 Cal.App.4th 1755, 1762.) The *James* and *Miranda* courts rejected this construction, concluding the Legislature intended "emergency medical coverage" to have a broader scope, so that the expert qualification requirement in subdivision (c) applies "if the emergency room physician has rendered *any kind of treatment* in a general acute care hospital's emergency department." (*James,* at p. 82, italics added; *Miranda,* at pp. 906-907; accord, *Zavala,* at pp. 1762-1763.)

16

causation and damages elements of a negligence claim. For those issues, a physician's experience working in an emergency room would do nothing to assist the trier of fact in determining whether the emergency room doctor's breach of the standard of care caused the plaintiff's injuries, nor would such experience assist a jury with its task of assessing what damages are reasonable to compensate the plaintiff for her injuries.

Dr. Baker attempts to explain this omission by arguing section 1799.110's reference to a "claim of negligence" is itself an indication that the Legislature intended the expert qualification clause to apply to testimony regarding causation. Citing the Medical Injury Compensation Reform Act's definition of "professional negligence" (Civ. Code, § 3333.1, MICRA), Dr. Baker asserts the term "claim of negligence" as used in section 1799.110 means "(1) a negligent act (breach in the standard of care) + (2) proximate cause (causation)."[3] Thus, she maintains section 1799.110 should be interpreted to apply to

---

[3]    Civil Code section 3333.1 defines " 'Professional negligence' " to mean "a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital." Though not particularly relevant to our decision, we agree with plaintiffs that Dr. Baker's reliance upon this statute is misplaced. Section 1799.110 does not use the term "professional negligence" in defining its scope, nor does it reference Civil Code section 3333.1 specifically or incorporate MICRA's provisions generally. As plaintiffs correctly observe, given that Civil Code section 3333.1 was enacted years before section 1799.110's predecessor, the use of the term "claim of negligence" in section 1799.110 instead of "professional negligence" indicates, if anything, that the Legislature intended the statutes to have different scopes.

standard of care and causation testimony.  The argument does little to resolve the arguable incongruity in the statutory text.

Regardless of how "claim of negligence" is defined, we have already recognized a literal reading of section 1799.110, subdivision (c) commands that the court "*shall* admit expert medical testimony *only* from physicians and surgeons who have had substantial professional experience within the last five years" in an emergency department.  (§1799.110, subd. (c), italics added.)  But that apparent categorical mandate is at odds with the rest of the statute, which, as other courts have recognized, seems to indicate a legislative intent to ensure only that the treatment provided in an emergency room "is evaluated under a standard of care essentially equivalent to that prevailing in emergency rooms at the time in the locality where the alleged negligence took place."  (*Miranda, supra,* 35 Cal.App.4th at p. 905.)  While that interpretation is compelling, we cannot ignore that it conflicts with a literal reading of the text.  Under this circumstance, it is proper to seek guidance from the legislative history of section 1799.110.  (See *Miranda,* at p. 902.)

  **b.**  ***The legislative history of section 1799.110 supports a construction limiting the expert qualification clause to standard of care testimony***

"Section 1799.110 was enacted in 1978 as former section 1768 and was part of a larger article on Good Samaritans." (*James, supra,* 30 Cal.App.4th at pp. 80-81, citing Stats. 1978, ch. 130, §§ 2, 8, pp. 342, 345.)  "The legislative package which included former section 1768 was designed to promote 'the development, accessibility, and provision of emergency medical services to the People of the State of California.' " (*James,* at p. 81, quoting Stats. 1978, ch. 130, § 2, p. 342.)  "The language of section 1799.110 is unchanged from the original language of former section 1768." (*Miranda, supra,* 35 Cal.App.4th at p. 902, citing Stats. 1978, ch. 130, § 8, pp. 345-346.)

18

As first proposed, Assembly Bill No. 1301 (A.B. 1301), which added former section 1768 to the Health and Safety Code, "sought to limit the civil damages exposure of certain professionals who provided emergency medical services in defined settings to only that liability which arose out of acts or omissions performed in a grossly negligent or intentional manner." (*Miranda, supra,* 35 Cal.App.4th at p. 903, citing Legislative Analyst (June 3, 1977) Analysis of Assem. Bill No. 1301 (1977-1978 Reg Sess.) as amended May 12, 1977.) A report to the Senate Judiciary Committee analyzing the proposed provision emphasized the "unusually high" malpractice exposure emergency room physicians face in comparison to other medical providers. (Sen. Com. on Judiciary (Aug. 8, 1977) Analysis of Assem. Bill No. 1301 (1977-1978 Reg Sess.) Section Dealing with Malpractice Liability for Emergency Physicians.) The report identified several unique characteristics of emergency room care to explain this disparate impact, including that "[e]mergency physicians must make instantaneous decisions on the diagnosis and treatment of emergency patients," while "[o]ther physicians have the ability to review past medical history, seek a consultation, study current medical literature, and reflect upon the proper diagnosis and course of treatment." (*Ibid.*) The report stressed that this factor, in particular, subjected emergency room physicians to unfair treatment in malpractice litigation, explaining: plaintiffs "may present expert testimony that the emergency physician was negligent," but a jury may not appreciate that "this expert witness had an opportunity to seek consultations, review medical texts, review the medical history, and reflect upon his testimony." (*Ibid.*) Without this relevant context, the report concluded, "it is extremely difficult in the calm atmosphere of the court room to recreate the atmosphere of urgency that existed in the emergency room." (*Ibid.*)

A.B. 1301 was repeatedly amended in the committee process. (*Miranda, supra,* 35 Cal.App.4th at p. 903, citing

Sen. Com. Rep. & Digest May 8, 1978.)  As a result, the limited civil liability shield was deleted, and the bill passed both legislative houses with the provisions that now appear in section 1799.110.  (*Miranda,* at p. 903, citing Letter of Assemblyperson Vic Fazio to Governor Edmund G. Brown, Jr. (May 10, 1978) urging the Governor to sign Assem. Bill No. 1301.)  In his letter urging the Governor to sign the legislation, the bill's author, Assemblyperson Vic Fazio, recounted these amendments, and echoed the concerns identified in the Senate Judiciary Committee report.  With respect to the expert qualification provision, Assemblyperson Fazio explained, the "provision is inherently fair as physicians are thereby compared to the *standard of care* exercised by their peers," thus preventing " 'super specialists' from second guessing the instantaneous decisions made by emergency physicians in emergency situations."  (Letter of Assemblyperson Vic Fazio to Governor Edmund G. Brown, Jr. (May 10, 1978), italics added.)

Critically, Governor Edmund G. Brown, Jr., nearly vetoed A.B. 1301 out of concern that its language could be read to "bar expert medical testimony on issues other than the standard of care expected of emergency room physicians."  (Governor's message to Assem. on Assem. Bill No. 1301 (May 11, 1978) 8 Assem. J. (1977-1978 Reg. Sess.) pp. 14236-14237.) The Governor allowed the bill to become law without his signature "based on a commitment from the author to support simultaneously effective legislation" to clarify the expert medical testimony provision and to impose a three-year sunset provision on the new statute.  (*Ibid.*)

Although the subsequent legislation did not pass,[4] Assemblyperson Fazio prepared the following statement

---

[4]    The clarifying language and sunset provision were proposed in Senate Bill No. 734, but the legislation did not pass the Assembly.  (Amend. to Sen. Bill No. 734 (Reg. Sess. 1977-1978) June 22, 1978; Assem. vote on Sen. Bill 734 (Aug. 30, l978)

20

of intent, which was printed in the Assembly Journal with the unanimous consent of the Assembly:

> "The purpose of this letter is to declare the legislative intent of Section 1768(c) of the Health and Safety Code as added by Assembly Bill 1301 (Chapter 130 of 1978).
>
> "As the author of AB 1301, I can state that it was the intent of the Legislature by enacting Section 1768(c) of AB 1301 to establish a five-year professional experience requirement as a condition to qualify as an expert medical witness in a medical malpractice lawsuit involving the provision of emergency medical services. The Legislature intended that this expert witness qualification apply *only* to those witnesses testifying as to the *standard of care* required of an emergency department physician and not to those witnesses testifying to the issue of recoverable damages. The legislative debate on AB 1301 focused exclusively on the qualifications required of an expert witness testifying on the issue of liability."

(Letter of Assemblyperson Vic Fazio to Assembly Speaker Leo T. McCarthy (Aug. 31, 1978) 10 Assem. J. (1977-1978 Reg. Sess.) p. 18447, italics added.)[5]

---

10 Assem. J. (1977-1978 Reg. Sess.) p. l8345; 8 Sen. J. (1977-1978 Reg. Sess.) p. 15043.)

[5]      As the *Miranda* court explained, the legislative materials we have used to assist in ascertaining legislative intent are proper for the purpose. (*Miranda, supra,* 35 Cal.App.4th at p. 903, fn. 8.) Legislative committee reports (*Commodore Home Systems, Inc. v. Superior Court* (1982) 32 Cal.3d 211, 219; *Curtis v. County of Los Angeles* (1985) 172 Cal.App.3d 1243, 1250) and

These materials are consistent with the apparent legislative purpose evidenced in section 1799.110's broader statutory language. They show that the Legislature was concerned about the "unusually high" malpractice exposure emergency room physicians face, and that lawmakers sought to address this perceived unfairness by putting protections in place to ensure the trier of fact judged an emergency room physician's conduct based on evidence that did not ignore or obfuscate the unique challenges presented by the emergency room environment. And, while some of the materials broadly referred to claims of "negligence" or "expert testimony that the emergency physician was negligent," it is apparent from the context of these statements that the legislative analysts were focused on how a jury would judge the reasonableness of an emergency room physician's conduct—not the causation or damages elements of a negligence claim. Indeed, like the statutory text, these legislative materials contain no discussion of the sort of proof that should be required to establish an emergency room physician's conduct

---

preenactment reports by the Legislative Analyst (*Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 300) have been sanctioned as legitimate sources of legislative intent. In addition, a statement by the sponsoring legislator has also been approved, to the extent it "evidences the understanding of the Legislature" and not simply the particular legislator's personal views. (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 589; see also *People v. Overstreet* (1986) 42 Cal.3d 891, 900, and *California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699-700.) The cited portions of the letters from Assemblyperson Fazio to Governor Brown and Assembly Speaker McCarthy meet this test, as they recapitulate the "discussion and events leading to adoption of proposed amendments" that transpired during the legislative processing of the bill. (*California Teachers Assn.,* at pp. 699-700; *Miranda,* at p. 903, fn. 8; see also *In re Marriage of Bouquet,* at p. 590.)

caused the plaintiff's alleged injuries or what damages would constitute reasonable compensation.

The most compelling evidence of legislative intent to be found in these materials is the express statement of the bill's author declaring that "[t]he Legislature intended that this expert witness qualification apply *only* to those witnesses testifying as to the *standard of care* required of an emergency department physician."  (Letter of Assemblyperson Vic Fazio to Assembly Speaker Leo T. McCarthy, *supra*, 10 Assem. J. (1977-1978 Reg. Sess.), p. 18447, italics added.)  Insofar as the Assembly unanimously consented to printing this statement in the Assembly Journal "to declare the legislative intent of AB 1301" (*id.* at pp. 18447-18448), it strongly indicates lawmakers intended the expert qualification requirement to have a more limited scope than a literal reading of the clause would suggest.

The only cause for doubt is the Legislature's failure to pass the clarifying legislation Governor Brown demanded in allowing the bill to become law without his signature.  (See Governor's message to Assem. on Assem. Bill No. 1301, *supra*, 8 Assem. J. (1977-1978 Reg. Sess.) pp. 14236-14237.)  But curious as this is, we are also mindful of our Supreme Court's warnings that courts "can rarely determine from the failure of the Legislature to pass a particular bill what the intent of the Legislature is with respect to existing law" (*Ingersoll v. Palmer* (1987) 43 Cal.3d 1321, 1349) and that "[u]npassed bills, as evidences of legislative intent, have little value" (*Dyna–Med, Inc. v. Fair Employment & Housing Com*. (1987) 43 Cal.3d 1379, 1396).  Moreover, although the materials we have reviewed are limited, it does appear that resistance to the Governor's demand for a three-year sunset provision may have been the principal factor that undermined the legislation.  (See *Sav-On Drugs, Inc. v. County of Orange* (1987) 190 Cal.App.3d 1611, 1623 [reasoning nothing reliable could be gleaned from rejected amendments because "[t]he Legislature may have objected to other portions of the bills,

23

for example, and not felt any further clarification . . . was necessary"].)

In any event, notwithstanding the fate of the clarifying legislation, we find the legislative materials strongly support the construction, already reached by several other courts, that section 1799.110 applies only to evidence regarding the standard of care required of an emergency room physician. This was the express understanding and intent of the Legislature that passed the measure and of the Governor who permitted it to become law.

### c. *Limiting the expert qualification clause to standard of care testimony is the only reasonable construction of the provision*

Finally, we consider the practical consequences of adopting either a literal construction of section 1799.110 or one limiting the expert qualification clause to standard of care testimony. We conclude the latter construction is the only reasonable interpretation, as it satisfies the statute's apparent legislative purpose, while avoiding needless conflicts with Evidence Code section 720 and absurd consequences that the Legislature could not have intended. (See *Younger, supra,* 21 Cal.3d at p. 113.)

"Whenever [a] plaintiff claims negligence in the medical context, the plaintiff must present evidence from an expert that the defendant breached his or her duty to the plaintiff and that the breach caused injury to the plaintiff." (*Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 123.) Under Evidence Code section 720, "[a] person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) "Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert." (*Ibid.*)

Plaintiffs alleged in their complaint that Dr. Baker breached the standard of care by "fail[ing] to order and perform

24

a lumbar puncture" in order to rule out a subarachnoid hemorrhage when Ms. Stokes presented to the emergency room. Consistent with that allegation, plaintiffs' standard of care expert, Dr. Ritter, opined that "had Dr. Baker complied with the standard of care, a lumbar puncture would have been performed, and, to a reasonable degree of medical probability, Ms. Stokes would have been diagnosed with a subarachnoid hemorrhage." The trial court ruled Dr. Ritter's declaration raised "triable issues of material fact as to whether Dr. Baker's care and treatment of Ms. Stokes complied with the applicable standard of care." However, the court granted Dr. Baker's summary judgment motion on the ground that plaintiffs' causation expert, Dr. Rappard, did not have the requisite professional experience in an emergency room to offer medical testimony under section 1799.110, subdivision (c).

The trial court's ruling was consistent with a literal reading of section 1799.110's expert qualification clause, but the result was absurd in light of the fundamental requirements for expert testimony set forth in Evidence Code section 720. With respect to the standard of care, both section 1799.110 and Evidence Code section 720 required the proffered experts to have special knowledge of the care a medical professional should provide under emergency conditions; section 1799.110 simply imposed the additional requirement that the experts have substantial professional experience in an emergency room within the last five years. (See *Avivi v. Centro Medico Urgente Medical Center* (2008) 159 Cal.App.4th 463, 467-470.) But as for causation, given plaintiffs' theory of liability (Dr. Baker's failure to diagnose a subarachnoid hemorrhage before it developed into a ruptured aneurysm), Evidence Code section 720 plainly required special knowledge, skill, experience, training, or education regarding the treatment of brain aneurysms or subarachnoid hemorrhages and the differing morbidity rates attributable to delays in diagnosing these conditions. As Dr. Rappard's declaration demonstrates,

25

specialized knowledge of these neurointerventional options was necessary to aid the trier of fact's assessment of what injuries could have been prevented had Ms. Stokes's subarachnoid hemorrhage been timely diagnosed. In contrast, an understanding of the unique challenges that an emergency room environment presents, though potentially relevant to explaining why Dr. Baker failed to diagnose the hemorrhage, would do little to assist the trier of fact in determining whether that failure was a substantial factor in causing Ms. Stokes's alleged injuries.

Literally construing section 1799.110's expert qualification clause to apply beyond standard of care testimony is neither reasonable nor necessary to a fair assessment of whether an emergency room doctor's conduct caused a plaintiff's alleged injuries. As this case demonstrates, such a construction would result in obvious absurdities, requiring emergency room physicians to render opinions far outside their area of expertise that they are not qualified to give under Evidence Code section 720. The practical effect, as plaintiffs rightly point out, would be to close the courthouse doors to plaintiffs in cases like this one, where causation and damages implicate medical issues outside the practice of emergency department physicians.[6] These

---

[6] The trial court correctly ruled plaintiffs' standard of care expert, Dr. Ritter, was not qualified to offer expert medical testimony regarding causation; however, the same also was true of Dr. Baker's medical expert, Dr. Lawrence. Like Dr. Ritter, Dr. Lawrence is an emergency medicine physician with no specialization or apparent experience in either neurosurgery or neurointerventional surgery. After reviewing the trial court record and the parties' appellate briefs, we sent a letter to the parties requesting supplemental briefing to address what special knowledge, skill, experience, training, or education was sufficient under section 1799.110 and *Evidence Code section 720* to qualify an expert to opine to a reasonable medical probability that Dr. Baker's breach of the standard of care—i.e., the failure to perform a lumbar puncture and diagnose Ms. Stokes with a

26

predictably absurd consequences are strong evidence, in addition to the statute's structure and legislative history, that the Legislature intended section 1799.110, subdivision (c) to apply only to standard of care testimony.

**3.** ***The Trial Court Erred in Striking Dr. Rappard's Causation Declaration***

The trial court struck Dr. Rappard's declaration on the ground that he was not qualified to offer medical testimony under the court's literal construction of section 1799.110. Because the court also determined Dr. Ritter was not qualified to offer a medical opinion regarding causation, the court concluded plaintiffs failed to raise a triable issue of fact on the issue. As we hold section 1799.110, subdivision (c) must be construed to apply only to standard of care testimony, we conclude the court erred in striking Dr. Rappard's declaration on the subject of causation. And, because we find Dr. Rappard's declaration was sufficient to raise a triable issue of fact regarding causation, the summary judgment in favor of Dr. Baker must be reversed.

---

subarachnoid hemorrhage—was not a substantial factor in causing Ms. Stokes to suffer a ruptured aneurysm that otherwise would have been successfully repaired by neurointerventional surgery. While Dr. Baker reiterated her position that section 1799.110's expert qualification requirement applied to medical causation testimony, her response conspicuously omitted any discussion of the qualifications required under Evidence Code section 720. At oral argument, however, Dr. Baker's counsel conceded Dr. Lawrence was not qualified under Evidence Code section 720 to opine on causation as framed in plaintiffs' complaint. Although we do not reverse the judgment on this ground, since plaintiffs did not object to Dr. Lawrence's declaration below, we do hold that unless Dr. Lawrence is able to show he has special knowledge, skill, experience, training, or education regarding the neurosurgical issues raised by plaintiffs' theory of liability, he is not qualified to offer medical testimony on causation under Evidence Code section 720.

27

## DISPOSITION

The summary judgment is reversed.  Plaintiffs Clara Stokes and Vaughn Stokes are entitled to their costs.

**CERTIFIED FOR PUBLICATION**


EGERTON, J.

We concur:


EDMON, P. J.


DHANIDINA, J.